[No. A122777. First Dist., Div. Two. Sept. 29, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
ANDREW JAMES VANCE, Defendant and Appellant.

**COUNSEL**

Matthew Zwerling and Tara Mulay, under appointments by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Stan Helfman and Masha A. Dabiza, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

RICHMAN, J.—There is a tactic of advocacy, universally condemned across the nation, commonly known as "The Golden Rule" argument. In its criminal variation, a prosecutor invites the jury to put itself in the victim's position and imagine what the victim experienced. This is misconduct, because it is a blatant appeal to the jury's natural sympathy for the victim. (See *People v. Lopez* (2008) 42 Cal.4th 960, 969–970 [71 Cal.Rptr.3d 253, 175 P.3d 4], and decisions cited.)

A jury found defendant Andrew James Vance guilty of first degree murder, without special circumstances, following which he was sentenced to state prison for the term prescribed by law. He contends he is entitled to reversal by reason of (1) numerous instances of misconduct by the prosecutor; (2) erroneous admission of a postarrest confession elicited in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602]; and (3) the jury improperly learning that he had been incarcerated in San Quentin. We conclude that the prosecutor made a sustained Golden Rule closing argument so blatant that it alone requires reversal, particularly when conjoined with improper references to what was in plain effect victim impact evidence, and a snide and utterly unwarranted attack on defense counsel's valiant attempts to halt the flood of misconduct. An unfortunate factor in aggravation was the trial court's refusal to give the admonition requested by the defense. Given the peculiar balance of the sole evidentiary point submitted to the jury—defendant's intent—we conclude the misconduct qualifies as prejudicial, requiring reversal.

In light of this conclusion, all but one of defendant's remaining contentions need not be addressed because they involve matters unlikely to recur at a retrial. The one contention we do address is defendant's claim of *Miranda* error, which we conclude is without merit.

## BACKGROUND

Except in one particular, the jury was not presented with material conflicts in the evidence, only the strength of the incriminating conclusion to be drawn from the largely undisputed testimony and trial exhibits.

It appears accepted that the victim, Dipak (Deuce) Prasad, died on June 2, 2006.[1] It further seems that it all began with Prasad telling defendant's girlfriend, Jennifer Delong, that he, defendant, was sleeping with another

---

[1] Dates mentioned refer to the calendar year 2006. As will appear, the principals to the killing, at the time of the killing, were consuming various controlled substances, which may well have induced some impairment of their recollective faculties. In his opening brief, defendant explains some of the ensuing chronological difficulties, but sensibly accepts June 2 as the date on which the events leading to the victim's death occurred. So do we.

woman. Delong confronted defendant with this report, and its source, and left town, much to defendant's distress.

On the afternoon of June 2, defendant confronted Prasad about what he, Prasad, had told Delong. Prasad thought what he told defendant had defused defendant's anger. The two thereafter spent several hours getting and consuming methamphetamine, all the while Prasad unaware that defendant was bent on revenge.

Defendant intended to teach Prasad a lesson with a beating. His friend Kevin West agreed to assist.[2] Defendant and Prasad met up with West, and, with Prasad driving his Lexus, they then went to Ronnie Pedrosa's auto shop. Pedrosa, who had been in prison with defendant and West, had also agreed to help with the beating of Prasad. They all ingested some methamphetamine provided by Prasad. Pedrosa had to beg off participating in the beating because he had to take care of a friend's children.[3] Before the group left, and without telling either West or Pedrosa, defendant took some black plastic "zip ties" from Pedrosa's shop.[4]

Prasad drove defendant and West in Prasad's Lexus to a friend's house, where they had more methamphetamine. They then drove to Palomares Canyon, looking for an address where defendant said they could get more methamphetamine. Palomares Canyon is located in an area that is not densely populated, and only poorly and intermittently lighted.[5] The canyon has a

---

[2] West, who first met defendant while they were both incarcerated, was originally a codefendant, but prior to trial pleaded guilty to the reduced charge of manslaughter. West agreed to accept a prison term of three years and to testify at defendant's trial.

[3] While incarcerated with defendant several months prior to the victim's death, Pedrosa heard defendant say that he wanted to "take care of" someone, but he did not name the person he meant. After both were released, Pedrosa agreed to let his garage be used as the "place to take care of" Prasad, who was not identified as the subject of their previous conversation. When asked what "take care of" meant, Pedrosa ventured that it meant defendant "wanted to hurt" Prasad. Pedrosa further testified that he did not take defendant seriously. Defendant testified that he did not know of the victim while he was incarcerated with Pedrosa, so could not have told Pedrosa that he intended to "take care of" Prasad.

According to defendant, he told Pedrosa "the same thing I told Kevin" about the justification for the beating. Defendant testified that it was Pedrosa who raised the possibility of going further than a beating. Defendant rejected this because "I didn't want to kill [Prasad], I just wanted to beat him up." His original plan was for the beating to occur at Pedrosa's shop, but this had to be changed "because the two little girls were there." When West suggested at the shop that "we hit [Prasad] over the head and put him in a barrel or something, I told him no, that I didn't want to do that because I wasn't trying to kill him or nothing, I was just trying to scare him."

[4] Defendant characterized "zip ties" as strips of firm plastic that have a locking mechanism, and employed by police "when they run out of handcuffs."

[5] Defendant did admit that it was his idea to take Prasad to Palomares Canyon because "we didn't know where we were going to beat him up because we didn't want to do it . . . where somebody would see."

creek at its bottom, approximately 75 feet down a steep incline from Palomares Road. It was about midnight.

Stopping in a driveway, the three got out of the Lexus. Defendant then put Prasad in a chokehold and rode him down to the ground; this occurred in a period West estimated as 30 to 90 seconds. According to West, Prasad "went limp" and began making snoring sounds. According to both West and defendant, neither of them ever kicked or punched Prasad, or hit him with any kind of object.

West testified that he and defendant then bound Prasad's hands and feet, West using a shoelace from one of Prasad's shoes to "tie up" his legs; they then put him in the trunk of the Lexus. Before Prasad was put in the trunk, West heard the sound of adhesive tape being unrolled. Defendant and West drove a short way to a more isolated part of the canyon. According to West—who described Prasad as being unconscious but still snoring—he and defendant threw him down the embankment of the canyon. Defendant followed this by throwing Prasad's shoe, presumably the one from which the lace had been removed, down the embankment.

Defendant testified that he put Prasad in a headlock for 20 to 30 seconds. He did not intend to actually choke Prasad, only "to restrain him . . . [¶] so Kevin could tie him up." "It was just [a] spur of the moment" decision. Defendant did not know that a chokehold could be life threatening. Defendant let go of Prasad when "he wasn't resisting anymore" and "started to . . . breathe funny," emitting "like a snoring sound." Defendant thought "I just rendered him unconscious," and Prasad "just passed out," because he was breathing and making the snoring sounds.

Defendant's version was that his plan was not to take Prasad into Palomares Canyon to kill him, just to beat him up, and then "leave him there, teach him a lesson," and take his car. According to defendant, West was the only one who took tape—black electrical tape—into Palomares Canyon, and the only one who did any binding of Prasad's hands and feet; it was West who fastened the zip ties on Prasad's hands, put his hands behind his back, and pinioned Prasad's feet with "black electrical tape and [a] shoelace." Defendant kept hold of Prasad, whose body was "wiggling a little bit." When he and West took Prasad out of the trunk of the Lexus, Prasad was not moving, but he was "still breathing" and "still snoring." "Then we . . . placed him on the side of the road." Prasad was not thrown into the ravine. And it was West who threw Prasad's shoe into the ravine.

Defendant and West then returned to Pedrosa's shop in Prasad's Lexus. According to West, defendant asked if Pedrosa "had any tools for digging," and whether he knew anyone who might want to buy the Lexus. Defendant told Pedrosa that he had "choked him [(Prasad)] out" and then "threw him off

the cliff." Pedrosa was not sure if defendant was serious or merely bragging. Defendant later told Delong the same thing. Defendant denied making any statement about tools. He did tell Pedrosa and Delong that he had thrown Prasad over the cliff, but he also told them that Prasad was alive when he was left in Palomares Canyon.

According to Pedrosa, a day or two later, he and defendant were driving in Palomares Canyon, and at one point defendant said something to the effect that he wondered whether Prasad "would climb back up from where [defendant] threw him off." Defendant drove the Lexus for several days, and later sold it in Fresno. Although Delong initially did not believe defendant's statement of what he did to Prasad, she came to believe it when defendant sold the Lexus, and after she received a telephone call from Prasad's sister trying to locate him. That same call apparently started defendant thinking that Prasad "might not be alive anymore" because "it's been so many days and he has not turned up." At that point defendant "was thinking that he might be deceased."

Things started unraveling on June 12, when Pedrosa was arrested for a parole violation, and he raised the subject of Prasad's situation in hope of receiving "some consideration." Under police guidance, Pedrosa made a number of recorded telephone calls to defendant in which defendant indicated awareness that Prasad's body was still in Palomares Canyon, and that the restraining zip ties should be removed.[6] Pedrosa also arranged a meeting with defendant at which defendant was arrested.

Prasad's body was found partially submerged in the creek of Palomares Canyon, with his hands tied behind his back "in an unnatural position" with black plastic zip ties. Both tennis shoes and socks were found nearby. A shoelace from one of the shoes was found attached to duct tape.

Due to decomposition and/or animal mutilation, forensic pathologist Dr. Thomas Rogers testified that the cause of death could not be pinpointed. The autopsy revealed no signs of bone fractures or blunt force trauma on the body. Dr. Rogers further testified a person can die of asphyxiation from a chokehold minutes after being released, and during this period the victim may appear unconscious or make noises such as wheezing, gasping, or snoring. Moreover, the duration of a chokehold resulting in death "can be just a few seconds or it can be upwards to minutes."

Defendant and West were arrested on June 13. The next day, defendant gave a lengthy statement to Officers Norton and Kelly, and then a shorter statement to an assistant district attorney. In his statement, and in his testimony at trial, defendant admitted that he was angry at Prasad because of

---

[6] It was right after receiving these calls that defendant shaved off his hair and mustache.

what Prasad had told his girlfriend; that what Prasad said was true, even if motivated by sexual jealousy; that he did put a chokehold on Prasad; that Prasad was alive when he and West left, and he had no intent to cause Prasad's death; and that he and West left Prasad by the side of the road, and did not throw him down the embankment.

In closing argument, defendant's counsel argued that, because of a learning disability and his drug consumption, defendant was guilty of manslaughter or, at most, second degree murder.[7]

## DISCUSSION

### The Prosecutor Committed Misconduct in Arguing That the Jury Should "Walk in [the Victim's] Shoes" and "Relive . . . What [the Victim] Experienced"

" 'It is, of course, improper to make arguments to the jury that give it the impression that "emotion may reign over reason," and to present "irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role, or invites an irrational, purely subjective response." [Citation.]' " (*People v. Redd* (2010) 48 Cal.4th 691, 742 [108 Cal.Rptr.3d 192, 229 P.3d 101].) "It has long been settled that appeals to the sympathy or passions of the jury are inappropriate at the guilt phase of a criminal trial." (*People v. Fields* (1983) 35 Cal.3d 329, 362 [197 Cal.Rptr. 803, 673 P.2d 680].)

Our Supreme Court has never departed from the opinion that "During the guilt phase of a capital trial, it is misconduct for a prosecutor to appeal to the passions of the jurors by urging them to imagine the suffering of the victim. 'We have settled that an appeal to the jury to view the crime through the eyes of the victim is misconduct at the guilt phase of trial; an appeal for sympathy for the victim is out of place during an objective determination of guilt.' " (*People v. Jackson* (2009) 45 Cal.4th 662, 691 [88 Cal.Rptr.3d 558, 199 P.3d 1098], quoting *People v. Stansbury* (1993) 4 Cal.4th 1017, 1057 [17 Cal.Rptr.2d 174, 846 P.2d 756]; accord, e.g., *People v. Mendoza* (2007) 42 Cal.4th 686, 704 [68 Cal.Rptr.3d 274, 171 P.3d 2]; *People v. Leonard* (2007) 40 Cal.4th 1370, 1406 [58 Cal.Rptr.3d 368, 157 P.3d 973]; *People v. Arias* (1996) 13 Cal.4th 92, 160 [51 Cal.Rptr.2d 770, 913 P.2d 980]; *People v. Pensinger* (1991) 52 Cal.3d 1210, 1250 [278 Cal.Rptr. 640, 805 P.2d 899]; see *People v. Millwee* (1998) 18 Cal.4th 96, 137 [74 Cal.Rptr.2d 418, 954 P.2d 990].) Although all of the Supreme Court decisions just cited are death

---

[7] The jury was given the option of finding defendant guilty of the lesser included offenses of second degree murder, voluntary manslaughter, or involuntary manslaughter.

penalty cases, Golden Rule arguments are just as improper in noncapital cases. (See *People v. Lopez, supra,* 42 Cal.4th 960 [defendant charged with sex crimes against minors]; *People v. Simington* (1993) 19 Cal.App.4th 1374 [23 Cal.Rptr.2d 769] [attempted murder].)[8]

It is equally established that it is misconduct for a prosecutor to argue that the jury in a noncapital case—or in the guilt phase of a capital case—should consider the impact of the crime on the victim's family. (E.g., *People v. Jackson, supra,* 45 Cal.4th 662, 691–692; *People v. Salcido* (2008) 44 Cal.4th 93, 151–152 [79 Cal.Rptr.3d 54, 186 P.3d 437]; *People v. Taylor* (2001) 26 Cal.4th 1155, 1171 [113 Cal.Rptr.2d 827, 34 P.3d 937].) The justification for both of these exclusionary policies is that they deal with subjects that are inherently emotional, possessing an unusually potent power to sway juries, and that their use must therefore be rigidly confined and controlled: "[P]enalty trials are different from guilt trials. Emotional appeals are allowed, and evidence that arouses emotions, including evidence of the suffering of the victims and their families, is generally admissible." (*People v. Smith* (2005) 35 Cal.4th 334, 364 [25 Cal.Rptr.3d 554, 107 P.3d 229].)

Defendant contends that both of these principles were violated by the prosecutor's closing argument. The details are as follows:

The prosecutor opened her remarks by summarizing for the jury why the evidence showed that defendant was guilty of "a killing" that "was intentional" and "done with malice aforethought." She then examined the concepts of murder and manslaughter on which the jury would be instructed. The prosecutor then commenced a lengthy examination of the trial evidence to persuade the jury that defendant was guilty of first degree murder and, failing that, he was "at least guilty of second degree murder." The following exchange then occurred:

---

[8] No less notable than the universality of disapproval is the absence of extended explanation for the disapproval. Perhaps the point is thought too obvious to require more than a mention. Among the California sources, the following by the late Justice Sims seems to be most developed discussion for the prohibition: "The appeal to a juror to exercise his subjective judgment rather than an impartial judgment predicated on the evidence cannot be condoned. It tends to denigrate the jurors' oath to well and truly try the issue and render a true verdict according to the evidence. (Code Civ. Proc., § [232].) Moreover, it in effect asks each juror to become a personal partisan advocate for the injured party, rather than an unbiased and unprejudiced weigher of the evidence." (*Neumann v. Bishop* (1976) 59 Cal.App.3d 451, 484–485 [130 Cal.Rptr. 786].) In civil cases, courts have also pointed to a lack of relevance: " 'The only person whose pain and suffering is relevant in calculating a general damage award is the plaintiff. How others would feel if placed in the plaintiff's position is irrelevant.' " (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 797, fn. 4 [16 Cal.Rptr.3d 374, 94 P.3d 513], quoting *Loth v. Truck-A-Way Corp.* (1998) 60 Cal.App.4th 757, 764–765 [70 Cal.Rptr.2d 571].)

"[Ms. Ynostroza:] In order for you as jurors to do your job, you have to walk in Dipak Prasad's shoes. You have to literally relive in your mind's eye and in your feelings what Dipak experienced the night he was murdered. You have to do that. You have to do that in order to get a sense of what he went through. Can you imagine thinking about just hanging out with your friends, people who you think are your friends, driving them around in your car from place to place. Being told to drive to Palomares, thinking you're going for one reason, being completely unaware that there's another plan. Being told to turn into a dark driveway, no cars in sight. Being told to turn off your car engine, the lights, the music. Getting out of your car with the two people you thought up to that point were your friends, the one you just had met that night and the one you have been with before. And then suddenly, without warning, being jumped, being put into a choke hold, taken down to the ground and choked out. You're trying to gasp for air but the pressure from the choke hold doesn't let up. You don't know what's going on and at first you think it's a nightmare.

"We all on one occasion or another have experienced the sense of what it's like to be suffocated to a lesser degree, maybe when we've swallowed some water or beverage and it's gone down the wrong way. Maybe you were held underwater too long while swimming or playing in water as a child. Maybe we suffer from asthma or some other respiratory problem. Maybe we've had the wind knocked out of ourselves before. There's nothing more terrifying than a feeling of not being able to breathe. You're totally trapped. Trapped in darkness without the ability to breathe—

"Mr. Mann: I object to this, this is improper argument, based on the facts of the evidence in this case.

"The Court: Sustained. Proceed, Counsel.

"Ms. Ynostroza: You don't know what's going on. How long are you conscious in this situation? When do you know to fight? When do you get to fight? What are you thinking to yourself at that time, what did I do, why me. This hurts.

"Mr. Mann: Objection, same objection, your Honor.

"The Court: Sustained.

"Ms. Ynostroza: Defense is objecting because the defense believes that I'm painting too graphic a picture.

"Mr. Mann: Objection, your Honor, improper argument.

"The Court: Sustained. Counsel, proceed.

"Ms. Ynostroza: What I am describing to you is what happened in the last moments of Dipak's life, what the evidence shows at the end of Dipak's life, not what I want to say happened, what the evidence has shown happened.

"Your job as jurors is to determine how bad this murder was. You must decide what exists beyond the elements of murder and part of that is the pain and suffering of Dipak.

"Mr. Mann: Objection, pain and suffering of the victim is irrelevant and what he was feeling at the time was irrelevant.

"The Court: Sustained.

"Ms. Ynostroza: I know that you don't want to look at the photographs that I put up, you don't want to look at them but you need to. You need to understand what the evidence is in this case and what you have to work with, and that there's sufficient evidence to prove beyond a reasonable doubt that the defendant is guilty of murder.

"We as human beings want to turn off violence. We don't want to think about it, we want to forget. We want to numb ourselves to it. You may not have wanted to hear specific details about what happened to Dipak but you know that as jurors your role is to evaluate the evidence, and in so doing you need to consider what you're presented with.

"Hope makes the most unbearable situation bearable. When there's life there's hope. Dipak had hope and that hope was taken away at the hands of the defendant. No matter how horrible a situation is all we have is hope. The defendant's actions and the defendant's actions alone took and crushed the hope of Dipak but not just his—

"Mr. Mann: Objection, improper argument.

"The Court: Overruled. Proceed.

"Ms. Ynostroza: —not just his hope but the hope of family and friends. There's no evidence whatsoever that Dipak deserved this to happen. It's not right. It's not fair. It's not lawful conduct under the law as you'll be

instructed. Defendant's violence touched various people. It's permanent. It's not right. It's bad enough to lose loved ones from natural causes but when it happens—[9]

"Mr. Mann: Objection, your Honor, improper argument.

"The Court: Sustained. Proceed, Counsel.

"Ms. Ynostroza: One of the things that is extremely deceiving in this courtroom is the defendant's appearance throughout this trial. You see a person sitting in the defendant's chair, you know he's in custody, he's rotated possibly you noticed the same couple of shirts and ties, there's a certain amount of empathy. You look at the defense table and the defendant has been sitting there looking like a pitiful excuse for a human being.

"Mr. Mann: Objection, your Honor, this is improper argument.

"The Court: Overruled.

"Mr. Mann: Misconduct.

"The Court: I'll let that last comment stand.

"Ms. Ynostroza: You may be looking at him and may have been looking at him throughout the trial thinking he really doesn't look like a murderer. You may even feel sorry for him or felt sorry for him at different points. Keep in mind that that was not the person that Dipak Prasad saw that night up in Palomares Canyon. Let there be no concern that this is not a pitiful situation, the defendant is not pitiful and certainly had no pity, compassion or mercy for Dipak when he viciously attacked him up in Palomares. He took everything from Dipak, his life, his hope and to add insult to injury, as I said, his car, everything."

Very shortly thereafter—a mere three pages in the reporter's transcript—the following occurred at a break before defense counsel began his closing argument:

"Mr. Mann: . . . Just for the record, Judge, obviously during Ms. Ynostroza's closing arguments, I made objections several times. Most of which the court

---

[9] Near the start of her remarks, the prosecutor had told the jury: "There's a tendency as you hear about the defendant to forget about the person that he murdered. You never got to know much about Dipak Prasad, the victim in this case. Yes, you heard testimony from the beginning of the case starting off with Dipak's older sister Geeta Devi. Then you heard from Michael Ames, Dipak's best friend, but they were only able, based on the information we could ask them, to give you a brief insight of who Dipak was as a brother and as a friend."

sustained. And I want to put out on the record at this time that I believe that those statements that she made regarding [what] Mr. Prasad might have been feeling that say that my client had taken away his hopes and dreams, think about how the victim's family may be feeling, how they lost a loved one, those are all statements intending to inflame the passions of the jury, and that is something that is not within the duty of the jury to consider. And it's clear from the jury instructions that they are not to base their decision upon anything but the facts and evidence in this case, and not upon issues of bias, prejudice, feelings of sympathy, that they might garner towards the alleged victim or victim's family members.

"And so this was improper argument and I believe rises to a level of prosecutorial misconduct, and based upon that I'm moving for a mistrial.

"The Court: Ms. Ynostroza?

"Ms. Ynostroza: Well, I think we have the record of what I said. The court sustained the objections. I moved on. I didn't continue on but these arguments that have been made in numerous other cases, this type of argument and they have been upheld, and I do not believe that they are inappropriate. The jury was never told that they are to take that into consideration but they can understand the circumstances and the actions and the situation that they are presented with and they are to consider the evidence and follow the instructions that the court gives them, and that was made clear to them.

"The Court: Thank you, Counsel. Motion for mistrial would be denied. I believe I made the appropriate ruling on the objections. If there was misconduct or inappropriate argument, I don't feel it amounted to conduct sufficient for a mistrial." The court took under submission a defense request that the jury be admonished. After defense counsel concluded his closing argument, the court denied the request for admonition in the belief that it "would merely highlight any kind of ruling I had previously made."

The prosecutor's alleged misconduct was also one of the grounds on which defendant moved for a new trial, and for reduction of the conviction to second degree murder (Pen. Code, § 1181, subd. 6). The trial court denied both motions.[10]

---

[10] With respect to defendant's claim that the prosecutor's closing argument constituted misconduct warranting a new trial, the court stated: "I did sustain, I would at least say a majority of your objections; however, I do not feel they []rose to the level of prosecutorial misconduct requiring a new trial or further admonishment." And in refusing to reduce the crime, the court expressed this view of the crime: "If you think about it very logically, if you didn't know anything about law or facts, you have a guy's hands bound behind his back. Without the animal gnawing or the deterioration of time, you have somebody strangled with

The Attorney General argues that the issue has not been preserved for appeal because defendant did not object until well into the prosecutor's remarks: "Appellant here complains of a number of statements in the prosecutor's closing argument, but the record discloses that defense counsel objected only toward the end of the complained-of comments. Counsel had ample opportunity to object to the prosecutor's comments about the details of Dipak's murder prior to the appearance of the complained-of remarks. For his objection to have been timely, defense counsel should have objected and requested an admonition long before he did here." We do not agree.

 The premise of this argument is profoundly troubling. The Attorney General appears to believe that an objection must be made at the very outset of assertedly improper comments, and only at the very beginning, lest the power to object be effectively lost. In other words, there can be no effective objection once the improper remarks are underway. It is understandable why the Attorney General does not cite a single decision that endorses such a draconian rule. It makes no allowance for defense counsel who may be a little slow to appreciate the thrust of the argument. It makes no allowance for counsel who might initially decide not to object in the tactical hope that an improper remark is isolated, and therefore should not be emphasized to the jury with an objection. As shown above, once defense counsel decided to object to the prosecutor's continued argument, he did so—repeatedly and insistently—in a timely manner. We therefore reject the argument that defendant's contention was not preserved for review.

 The condemnation of Golden Rule arguments in both civil and criminal cases, by both state and federal courts, is so widespread that it is characterized as "universal." (See *State v. Bell* (2007) 283 Conn. 748 [931 A.2d 198, 214]; *Peterson v. State* (Fla.Dist.Ct.App. 1979) 376 So.2d 1230, 1233; *Granfield v. CSX Transportation Co.* (1st Cir. 2010) 597 F.3d 474, 491; *Ivy v. Security Barge Lines, Inc.* (5th Cir. 1978) 585 F.2d 732, 741; *U.S. v. Teslim* (7th Cir. 1989) 869 F.2d 316, 328; *Joan W. v. City of Chicago* (7th Cir. 1985) 771 F.2d 1020, 1022; *Lovett ex rel. Lovett v. Union Pacific Railroad Co.* (8th Cir. 2000) 201 F.3d 1074, 1083; *Blevins v. Cessna Aircraft Co.* (10th Cir. 1984) 728 F.2d 1576, 1580.)[11] And, as already shown, California joins with

---

his hands bound behind his back. It sounds like an execution murder to me . . . . [¶] . . . [¶] This was a cold-blooded, deliberate, premeditated murder. The jury . . . got this decision right, it's a first degree murder." The court's characterization of the crime was inaccurate in two significant particulars. If the court meant to indicate that Prasad was strangled to death, this went beyond Dr. Rogers's inability to identify the precise cause of death. If the court meant "strangling" to refer to the chokehold used by defendant, that occurred before Prasad's hands and feet were bound, not after.

[11] For a sampling of decisions holding Golden Rule arguments improper, see *Beaumaster v. Crandall* (Alaska 1978) 576 P.2d 988, 994; *Delaware Olds, Inc. v. Dixon* (Del. 1976) 367 A.2d 178, 179; *Lycans v. Commonwealth* (Ky. 1978) 562 S.W.2d 303, 306; *Chisolm v. State* (Miss.

the nation in generally prohibiting Golden Rule arguments by counsel in criminal trials[12]—a near-categorical prohibition attributable to the unusually potent prejudicial impact of a Golden Rule argument in determining guilt. (See fn. 8, *ante.*)[13]

The same is true for victim impact evidence, which relates "to the personal characteristics of the victim and the emotional impact of the crime on the victim's family." (*Payne v. Tennessee* (1991) 501 U.S. 808, 817 [115 L.Ed.2d 720, 111 S.Ct. 2597].) "A jury properly may consider the impact of the crime on the victim's family. [Citation.] Such victim-impact evidence assists the jury in assessing 'evidence of the specific harm caused by the defendant['s]' crime by 'demonstrating the loss to the victim's family and to society which has resulted from the defendant's homicide.' [Citation.] Accordingly, just as a prosecutor may ask the jurors to put themselves in the shoes of the victim, a prosecutor may ask the jurors to put themselves in the place of the victim's family to help the jurors consider how the murder affected the victim's relatives." (*People v. Jackson, supra,* 45 Cal.4th 662, 692.) However, again, this is allowed only in the penalty phase of a capital trial.

We are completely unpersuaded by the Attorney General's attempt to bring the prosecutor's arguments within the general freedom of a prosecutor's "wide latitude to discuss and draw inferences from the evidence at trial." Such a construction is utterly untenable with an argument that began with the prosecutor telling the jurors "you have to walk in Dipak Prasad's shoes. You have to literally relive in your mind's eye and in your feelings what Dipak experienced the night he was murdered. You have to do that. You have to do that in order to get a sense of what he went through." We literally cannot see how this is not a blatant argument for the jury "to view the crime through the

---

1988) 529 So.2d 635, 639–640; *McGuire v. State* (1984) 100 Nev. 153 [677 P.2d 1060, 1064]; *State v. Carlson* (1997) 1997 ND 7 [559 N.W.2d 802, 811–812]; *Von Dohlen v. State* (2004) 360 S.C. 598 [602 S.E.2d 738, 745]; *World Wide Tire Co. v. Brown* (Tex.App. 1982) 644 S.W.2d 144, 145–146; *Adkins v. Aluminum Co. of America* (1988) 110 Wn.2d 128 [750 P.2d 1257, 1264–1265]; *Hodge v. Hurley* (6th Cir. 2005) 426 F.3d 368, 384; *U.S. v. Palma* (8th Cir. 2007) 473 F.3d 899, 902; *Grossman v. McDonough* (11th Cir. 2006) 466 F.3d 1325, 1348. For a collection of older civil decisions, see Annotation, Prejudicial effect of counsel's argument, in civil case, urging jurors to place themselves in the position of litigant, or to allow such recovery as they would wish if in the same position (1960) 70 A.L.R.2d 935.

[12] California's condemnation also applies to civil cases "in which counsel asks jurors to put themselves in the plaintiff's shoes and ask what compensation they would personally expect." (*Cassim v. Allstate Ins. Co., supra,* 33 Cal.4th 780, 797; see *Sabella v. Southern Pac. Co.* (1969) 70 Cal.2d 311, 319 [74 Cal.Rptr. 534, 449 P.2d 750].)

[13] Of course, enforcing this prohibition does not forbid mention of the victim, or banish every associative impulse, even during the guilt phase of a trial. Thus, there is no violation of the rule if the jury is asked to consider the victim's age and mental development in evaluating her credibility (see *People v. Lopez, supra,* 42 Cal.4th 960, 970), or the victim's physical characteristics (*People v. Millwee, supra,* 18 Cal.4th 96, 137; *People v. Garceau* (1993) 6 Cal.4th 140, 206 [24 Cal.Rptr.2d 664, 862 P.2d 664]).

eyes of the victim" and "to imagine the suffering of the victim." If this is not a Golden Rule argument, we cannot imagine what one would sound like.

Nor can the excerpts just quoted be dismissed as isolated. The prosecutor then worked on the victim's feelings and thoughts as he lost consciousness. After defense counsel unsuccessfully tried to stem the tide, the prosecutor resumed with "You don't know what's going on. How long are you conscious in this situation? When do you know to fight? When do you get to fight? What are you thinking to yourself at that time, what did I do, why me. This hurts." And then, after another defense objection was sustained, the prosecutor continued with "What I am describing to you is what happened in the last moments of Dipak's life . . . . [¶] Your job as jurors is to determine how bad this murder was. You must decide what exists beyond the elements of murder and part of that is the pain and suffering of Dipak," which drew yet another sustained objection.

In light of the manner in which the prosecutor developed her argument, it is clearly not possible to accept her subsequent statement opposing the mistrial motion. The record is utterly disproving of her bland assertion that after "[t]he court sustained the objections[;] I moved on[;] I didn't continue on . . . ." This is simply wrong as a matter of fact. And the prosecutor's followup assertion, that "these arguments . . . have been made in numerous other cases . . . and they have been upheld . . . ," is simply wrong as a matter of law.

Less egregious, but no less impermissible, was the prosecutor then working in what is obviously something like a victim impact argument to get the jury to expand their empathetic scope to the suffering of the victim's family caused by defendant's murder of Prasad.

██ Interspersed among these utterly improper arguments were two minor points that must be addressed. The first is the prosecutor's aside to the jury after defense counsel's second objection was sustained that "Defense is objecting because the defense believes that I'm painting too graphic a picture," which itself drew another sustained objection. Although not expressly aimed at defense counsel, in context it could not be construed as having any other target. As such, it too was improper. "A prosecutor commits misconduct if he or she attacks the integrity of defense counsel, or casts aspersions on defense counsel. [Citations.] 'An attack on the defendant's attorney can be [as] seriously prejudicial as an attack on the defendant himself, and, in view of the accepted doctrines of legal ethics and decorum [citation], it is never excusable.' " (*People v. Hill* (1998) 17 Cal.4th 800, 832 [72 Cal.Rptr.2d 656, 952 P.2d 673], quoting 5 Witkin & Epstein, Cal. Criminal Law (2d ed. 1989) Trial, § 2914, p. 3570; see 5 Witkin & Epstein,

Cal. Criminal Law (3d ed. 2000) Criminal Trial, § 592, p. 847.) Coming right after a defense objection had been sustained, and even though it brought another defense objection that was sustained, the clear implication of this "derisive comment" (*People v. Hill, supra,* at pp. 821, 838 ["rude and demeaning behavior towards defense counsel in front of the jury"]) was that defense counsel was endeavoring to present the jury with a sanitized version of the crime. " 'It is, of course, improper for the prosecutor "to . . . portray defense counsel as the villain in the case. . . . Casting uncalled for aspersions on defense counsel directs attention to largely irrelevant matters and does not constitute comment on the evidence or argument as to inferences to be drawn therefrom." ' " (*People v. Redd, supra,* 48 Cal.4th 691, 749; see *Cassim v. Allstate Ins. Co., supra,* 33 Cal.4th 780, 796 [counsel may not "make personally insulting or derogatory remarks directed at opposing counsel or impugn counsel's motives or character"].)

■ The second is the prosecutor's remarks about "the defendant's appearance throughout this trial" being "extremely deceiving" what with "the defendant . . . sitting there looking like a pitiful excuse for a human being." This was, at best, imprudent, because "comment during the guilt phase of a capital trial on a defendant's courtroom demeanor is improper . . . ." (*People v. Boyette* (2002) 29 Cal.4th 381, 434 [127 Cal.Rptr.2d 544, 58 P.3d 391].)

■ Unfortunately, the possible prejudicial effect of the improper comments by the prosecutor was exacerbated by the trial court's passive reaction to them. We assume that defense counsel's "improper argument" was sufficient to alert the court to the impermissible nature of the prosecutor's argument. But after it sustained the defense's second objection, the court could have been in no doubt as to the thrust of the prosecutor's argument, and its highly improper nature. At that point, a more active response would have been in order. " ' "Emotion must not reign over reason and, on objection, courts should guard against prejudicially emotional argument." ' " (*People v. Jackson, supra,* 45 Cal.4th 662, 691, quoting *People v. Leonard, supra,* 40 Cal.4th 1370, 1418; see *Sabella v. Southern Pac. Co., supra,* 70 Cal.2d 311, 321, fn. 8 ["[A] court should . . . intercede to prevent potentially prejudicial conduct of counsel."].) Certainly there is the natural impulse to "let counsel try their case," but the judge presiding over a criminal case has responsibilities more stringent than those in a civil case. And our Supreme Court has reversed a murder conviction by reason of a trial court's "failure to rein in" a prosecutor's "continual misconduct." (*People v. Hill, supra,* 17 Cal.4th 800, 821.)

■ "It shall be the duty of the judge to control all proceedings during the trial, and to limit the introduction of evidence and the argument of counsel to relevant and material matters, with a view to the expeditious and effective

ascertainment of the truth regarding the matters involved." (Pen. Code, § 1044.) Although the Supreme Court has construed this provision as ordinarily imposing "no sua sponte duty to . . . remedy misconduct" (*People v. Freeman* (1994) 8 Cal.4th 450, 490 [34 Cal.Rptr.2d 558, 882 P.2d 249]; accord, *People v. Medina* (1995) 11 Cal.4th 694, 727 [47 Cal.Rptr.2d 165, 906 P.2d 2]; *People v. Montiel* (1993) 5 Cal.4th 877, 915, 918 [21 Cal.Rptr.2d 705, 855 P.2d 1277], decisions cited), that is not the case here.

What is presented is a situation in which defense counsel repeatedly made objections to the prosecutor's Golden Rule argument, which the trial court sustained, and also requested that the jury be admonished, which the trial court refused. And a situation where defense counsel's objections to the prosecutor's victim impact argument was first overruled and then sustained. Thus, the situation here is one where the assistance of the court was sought by counsel to counteract clear misconduct, and where the court's duty—to respond to that request by curbing improper argument and ensuring that the jury is not led astray by improper comments—was no less clear.

▉ Concerning the omission of the admonition, the issue of timing is significant. "One of the primary purposes of admonition at the beginning of an improper course of argument is to avoid repetition of the remarks . . ." (*Sabella v. Southern Pac. Co., supra,* 70 Cal.2d 311, 320), and " 'forestall the accumulation of prejudice by repeating improprieties, thus avoiding the necessity of a retrial.' " (*People v. Brown* (2003) 31 Cal.4th 518, 553 [3 Cal.Rptr.3d 145, 73 P.3d 1137], quoting *Horn v. Atchison, T. & S. F. Ry. Co.* (1964) 61 Cal.2d 602, 610 [39 Cal.Rptr. 721, 394 P.2d 561].) Regrettably, the court did not perform that duty. Even after sustaining three defense objections, the trial court either failed to appreciate the true nature of the prosecutor's argument or perceived no need to halt it. The situation here is therefore to be distinguished from instances where a prosecutor's argument in misconduct is presumed neutralized by appropriate admonition from the court. (E.g., *People v. Price* (1991) 1 Cal.4th 324, 454–455 [3 Cal.Rptr.2d 106, 821 P.2d 610]; *People v. Green* (1980) 27 Cal.3d 1, 29 [164 Cal.Rptr. 1, 609 P.2d 468]; *People v. Pitts* (1990) 223 Cal.App.3d 606, 692 [273 Cal.Rptr. 757].)

### The Prosecutor's Misconduct and the Trial Court's Refusal to Admonish the Jury Demonstrate Reversible Error

It is the specific circumstances presented here that lead us to conclude that the prosecutor's misconduct tipped a very delicate balance—and thus qualifies as prejudicial.

First, this was not a case where the defendant disputed all culpability. Defendant never denied his participation in the events leading to Prasad's death. Indeed, in his closing argument, defendant's counsel conceded that defendant was guilty of at least involuntary manslaughter, and he appeared to accept that a verdict of voluntary manslaughter or even second degree murder would be reasonable.

 The prosecution's sole theory for the jury finding defendant guilty of first degree murder was that he had committed the willful, deliberate, and premeditated murder of Prasad. " '[M]urder which is perpetrated by any kind of willful, deliberate and premeditated killing with express malice afore-thought is murder of the first degree . . . .' " (*People v. Visciotti* (1992) 2 Cal.4th 1, 61 [5 Cal.Rptr.2d 495, 825 P.2d 388].) "First degree willful, deliberate, and premeditated murder involves a cold, calculated judgment, including one arrived at quickly [citation], and is evidenced by planning activity, a motive to kill, or an exacting manner of death." (*People v. Carasi* (2008) 44 Cal.4th 1263, 1306 [82 Cal.Rptr.3d 265, 190 P.3d 616].)

 "Second degree murder is the unlawful killing of a human being with malice aforethought but without the additional elements, such as willful-ness, premeditation, and deliberation, that would support a conviction of first degree murder. [Citations.] . . . '[M]alice may be either express or implied. It is express when there is manifested a deliberate intention to take away the life of a fellow creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart.' " (*People v. Knoller* (2007) 41 Cal.4th 139, 151 [59 Cal.Rptr.3d 157, 158 P.3d 731], quoting Pen. Code, § 188.) "Malice is implied when the killing is proximately caused by ' "an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." ' " (*Knoller*, at pp. 143, 157, quoting *People v. Phillips* (1966) 64 Cal.2d 574, 587 [51 Cal.Rptr. 225, 414 P.2d 353].) Knowledge of the risk of serious bodily injury is not enough; knowledge of a high probability of death is too much. "In short, implied malice requires a defendant's awareness of engaging in conduct that endangers the life of another—no more, and no less." (*Knoller*, at p. 143.)

As evidenced by his unsuccessful motion to reduce the crime to second degree murder (see fn. 10 and accompanying text, *ante*), defendant appeared willing to admit that the evidence was sufficient to support a conviction for second degree murder. However, he was adamant in closing argument that evidence was insufficient to prove first degree murder, particularly in that there was no intent to kill Prasad. Thus, it is germane to discuss *People v.*

*Anderson* (1968) 70 Cal.2d 15 [73 Cal.Rptr. 550, 447 P.2d 942], where our Supreme Court established an analytical template for determining the sufficiency of evidence to support a conviction for first degree murder.

██ Beginning with "the presumption that an unjustified killing of a human being constitutes murder of the second, rather than the first, degree" (*People v. Anderson, supra*, 70 Cal.2d 15, 25), the court established an approach to evaluating the three types of evidence indicative of first degree murder: "The type of evidence which this court has found sufficient to sustain a finding of premeditation and deliberation falls into three basic categories: (1) facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than the 'mere unconsidered or rash impulse hastily executed' [citation]; (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2).

██ ". . . [T]his court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)." (*People v. Anderson, supra*, 70 Cal.2d 15, 26–27.)

In other words, in the *Anderson* context defendant could have concluded that his actions did result in Prasad's death, but this does not demonstrate that the death was intentional.

We first note that there was no direct evidence that defendant set out on the evening of June 2 with the intent to kill Prasad. He never denied that he intended to administer a beating to Prasad to "teach him a lesson" for his informing Delong of defendant's cheating on her. His utterances to West and Pedrosa are consistent on this point. Certainly animus was present, but what "planning" evidence was there of a preexisting intent to kill? Taking the zip ties from Pedrosa's shop, ensuring that West accompanied him (and hoping to have Pedrosa in on it as well), gaining Prasad's confidence and perhaps lulling him into a false sense of safety, and taking him to a place where they would be unobserved, and then taking him by surprise with the chokehold, all

this can be seen as planning—but only if an intent to kill underlay these acts. An entirely different complexion is acquired if defendant's stated motive was not a smokescreen, but is accepted at face value. In sum, evidence of defendant's planning activity is hardly overwhelming.

What of the manner of the killing? Was it "so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way"? Granted, immobilizing Prasad and abandoning him in a situation where he was not likely to be immediately discovered could suffice, but only if it is accepted that defendant had knowledge of the lethality of the chokehold, that is, that he knew it would inevitably lead to Prasad's demise. Defendant had an advantage of 100 pounds or more on Prasad. Judging by his testimony and custodial statements, he seems to have been somewhat surprised by Prasad's being incapacitated by the chokehold. Crediting defendant's knowledge of the chokehold's consequences would in turn require accepting that defendant knew that Prasad would be fatally incapacitated when defendant threw the bound Prasad down the ravine according to a preconceived intent. With respect to this last point, the evidence was in conflict. West's version was contradicted by defendant's testimony. Defendant did make subsequent statements that he did throw Prasad down the ravine, but one recipient, Pedrosa, did not believe it, writing it off to defendant's bragging. Even so, in either version Prasad was alive, as West expressly testified. On the other hand, if defendant was given to braggadocio, why would he not boast of killing the person who had so offended him?

The second factor, defendant's "prior relationship and/or conduct with the victim," has largely been covered already. Defendant certainly had a relationship with Prasad, but a homicidal conclusion is hardly the ineluctable inference. The fact that Dr. Rogers could not identify a cause of death when he performed an autopsy on Prasad's desiccated remains does not compel the conclusion that Prasad died as the result of defendant's willful, deliberate, and premeditated intent.

We do not wish to be understood as holding that a jury could not conclude that defendant was in fact guilty of first degree murder. The record before us would, all other things being equal, be sufficient to uphold such a verdict. But the same jury could also conclude that defendant was at most guilty of no more than second degree murder, as defendant argued in the trial court. In short, the evidence for first degree murder might be legally sufficient, but it is far short of overwhelming.

In addition to the evidence for first degree murder being equally compatible with a conclusion that it showed no more than second degree murder, the

extent of the actual evidentiary dispute was quite narrow. There was no direct evidence that defendant desired the death of Prasad prior to the night of June 2. The testimony of defendant, West, Pedrosa, and Delong is unanimous on this point, all agreeing that defendant went no further than expressing the intent to administer a nonlethal beating for his supposed betrayal of defendant's infidelity to Delong. Both defendant and West, the only percipient witnesses to the events in Palomares Canyon, testified that Prasad was unconscious but still alive after the chokehold applied by defendant. The sole point of factual disagreement was whether Prasad was left by the side of the road or thrown down the canyon.

Thus, the only real issue for the jury to determine was defendant's mental state on the night of June 2. It is in this context that the prosecutor's misconduct must be deemed prejudicial.

The prosecution's evidence was hardly overwhelming in pointing to defendant's guilt *for first degree murder*. None of the prosecution's evidence directly and unambiguously pointed to the mental state required for first degree murder. Even giving the prosecution's evidence its maximum effectiveness, the two sides were in equipoise. With the case teetering on a knife edge, it would not take much to tilt the balance.

Because Prasad obviously did not testify as to his final thoughts, the prosecutor's Golden Rule argument plainly asked the jury to go beyond the evidence. Critically, the trial court's refusal to give the requested admonition did nothing to tell the jury that they should not. The absence of an admonition would also not draw the sting of the prosecutor's attack on defense counsel, whose efforts on behalf of defendant might therefore be viewed by the jury in an unfavorable light. Given the particularly powerful lure of the empathetic impulse to associate with the undoubted plight of the victim—the one incontestable point of a murder trial—we cannot assume the jury ignored the prosecutor's gambit. The prosecutor's invitation to consider the natural grief of the victim's relatives, several of whom the jury had heard testify (see fn. 9, *ante*), would only further shift the jury's attention from the evidence.

The prosecutor's improper arguments shifted the jury's attention from the evidence to the all too natural response of empathizing with the victim's suffering and his family's resulting torment. Once such emotions are unbridled, they are hard to rein in. (See *Sabella v. Southern Pac. Co., supra,* 70 Cal.2d 311, 321; *People v. Edgar* (1917) 34 Cal.App. 459, 471 [167 P. 891] [prosecutor's improper remarks were of the sort "it is not in human nature to forget or disregard . . ."].) Their inevitable impact would have "weighed heavily" against finding defendant guilty of manslaughter or second degree

murder, and they "may have been the deciding factors which brought about his conviction" of first degree murder. (*People v. Kirkes* (1952) 39 Cal.2d 719, 727 [249 P.2d 1]; accord, *People v. Braun* (1939) 14 Cal.2d 1, 8 [92 P.2d 402]; *People v. Hidalgo* (1947) 78 Cal.App.2d 926, 949 [179 P.2d 102].) In these circumstances, we think the standard instruction that argument of the attorneys is not evidence could have no palliative force because there was no likelihood the jury would have treated the prosecutor's argument as anything but argument.

"The sheer number of the instances of prosecutorial misconduct . . . is profoundly troubling. Considered together, we conclude they created a negative synergistic effect, rendering the degree of overall unfairness to defendant more than that flowing from the sum of the individual errors." (*People v. Hill, supra*, 17 Cal.4th 800, 847.) The trial court's reactions and inactions to the misconduct only aggravated the situation by removing the one restraint that might have operated on the jury. (E.g., *People v. Jackson, supra*, 45 Cal.4th 662, 691; *People v. Hill, supra*, at p. 821; see *Sabella v. Southern Pac. Co., supra*, 70 Cal.2d 311, 321 & fn. 8 [evaluation of misconduct should encompass "the judge's control . . . of the trial," including whether it acted to prevent or mitigate misconduct (fn. omitted)].) The ambivalent actions of the trial court did nothing to instruct the jury that consideration of such natural human impulses was inappropriate in the objective determination of defendant's guilt. In these circumstances, we think there is at least a reasonable probability that a more lenient verdict would have been returned in the absence of the errors.[14] (Cal. Const., art. VI, § 13; *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]; *People v. Edgar, supra*, 34 Cal.App. 459, 471 ["where as here, in a closely balanced criminal case, misconduct is repeated and persisted in, . . . and is so pronounced and pernicious that it is not in human nature to forget or disregard its prejudicial effect, then . . . the only remedy remaining is to be found in a reversal of the judgment."].)

### There Was No Error in the Denial of Defendant's *Miranda* Suppression Motion

Only one of the other contentions made by defendant deals with a matter that may arise on retrial.

---

[14] The authorities cited by the Attorney General against this conclusion are not persuasive. *People v. Arias, supra*, 13 Cal.4th 92, *People v. Stansbury, supra*, 4 Cal.4th 1017, *People v. Pensinger, supra*, 52 Cal.3d 1210, and *People v. Fields, supra*, 35 Cal.3d 329, are distinguishable because they are all capital cases, where, as already noted, Golden Rule and victim impact evidence are allowed but only in the penalty phase. In *People v. Simington, supra*, 19 Cal.App.4th 1374, 1379–1380, a Golden Rule violation was found harmless because the evidence against the defendant was overwhelming. This was not a capital case, and the prosecution's evidence could not possibly be characterized as overwhelming.

Defendant was arrested on June 13. He was first interviewed by officers, and four and one-half hours later by an assistant district attorney.

Prior to trial, defendant moved to suppress evidence of statements he made in the two interviews because his statements were elicited in violation of *Miranda v. Arizona, supra,* 384 U.S. 436. Following an evidentiary hearing pursuant to Evidence Code section 402, the court ruled that evidence of an initial interview by officers at the San Leandro police station on June 13 would be excluded as elicited in violation of *Miranda,* but that the second interview by the district attorney would be admissible. Defendant contends the second interview was tainted by the first because his invocation of his right to silence was ignored, and the statement was involuntarily induced by an improper promise of leniency. The contention is without merit.

Defendant was arrested at approximately 4:00 p.m. His videotaped interview with Officers Norton and Kelly began about 70 minutes later. After some orienting preliminaries, the following occurred:

"NORTON: All right first of all you have the right to remain silent. Do you understand that?

"VANCE: Yeah.

"NORTON: Anything you say can and will be used against you in a court of law. Do you understand that?

"VANCE: Yep.

"NORTON: Uh, you have the right to talk to a lawyer and have him present while you are being questioned. Do you understand that?

"VANCE: Yep.

"NORTON: If you cannot afford to hire an attorney, one will be appointed to represent you free of charge before any questioning if you wish one. Do you understand each of these rights I have explained to you?

"VANCE: Yeah.

"NORTON: Okay, why don't you tell me your side of the story?

"VANCE: I don't have a side of the story.

"KELLY: We just found Deuce's body in the creek in Palomares. His decomposed body. Alright, and we have already finished interviewing four different people, and we know what time it is.

"NORTON: Here is your opportunity to sit with us and tell us exactly what happened, because, like Ray said, we have already talked to a couple of different other people, we have already got Deuce's body, and we know what time it is. We need to hear exactly what happened from your perspective, why it happened, what motivated you, you know what I mean? What really happened, you know . . .

"KELLY: It was probably an accident or something bad happened. I don't know, but we need to find out.

"NORTON: But you just sitting here saying you don't know what we are talking about when we know you do. You know what I mean. You need to be honest with us, be honest with yourself. What happened?

"KELLY: Did you drive out with Deuce and Kevin West out to into Palomares? That's a yes or no, dude? We just . . .

"NORTON: Are you not going to talk to us, is that what you are doing?

"VANCE: No, I'm talking to you guys.

"NORTON: It's a simple question. Did you drive out there with Deuce and Kevin?

"KELLY: Look, dude, we're not here to . . . we just want to find the truth out, alright? We just want to hear your side of the story, how things went down, okay? We know Deuce is dead. That's fine, okay, and we are not sitting here saying you're some kind of crazy serial killer or something like that. Some bad shit happened. We just want to figure out what happened so we can tell Deuce's family, okay? Alright dude, we don't think anything of you, we're not here to judge you. We know it wasn't supposed to go down that way and it did you know what I mean. Something went down. It wasn't supposed to go that way, but it happened, bro, and now we have to get to the bottom of it, figure this shit out man, you know? I know you are upset man, but let's get through this together all right? We're not here to fuck with you, man.

"NORTON: It takes a big man to be honest all right and I know you have that in you all right. It takes a big man to be honest.

"[VANCE begins crying.]

"KELLY: Dude, it's okay, bro, alright. It's alright, bro. We're not here to mess with you, all right. We are here to listen and then to help you out.

"VANCE: (crying) That's what everybody always tells me and then I end up getting fucked.

"KELLY: Well, we're not here to do that bro, we're just here to find out the truth about what happened. And I think you have a lot on your chest right now, and I think you need to talk about this, I know you want to talk about this.

"NORTON: This has been weighing on you for the last two weeks.

"KELLY: The last two weeks have been fucked.

"NORTON: Tell us what happened. Come on Drew, what happened, buddy.

"KELLY: Keep it real with us Drew. Man we're not going to sit here and judge you, buddy.

"VANCE: (crying) It doesn't matter anyway I'm just going to go to prison and rot and never come out of there.

"NORTON: Drew, this is the thing, buddy. We need to know your side of the story. We need to know what happened. What happened out there, Drew? Tell us what happened out there.

"VANCE: It was an accident."

All of this took four minutes.[15]

Approximately three and one-half minutes later, Norton asked, "What happened once you guys got there, Andrew?" Defendant replied, "I don't want to talk about it." When, approximately four minutes later, Norton again asked, "So what happened when you guys . . . got out there Andrew?" defendant responded, "I don't want to talk about it. I'm just a bad person."

The trial court ordered evidence of this interview excluded, but stated, "my ruling is very limited. I'm going to find that there was not a valid waiver of *Miranda* in this case." The court further found that defendant had not invoked

---

[15] As measured by the timer on the videotape, which we have watched.

his right to silence under the Fifth Amendment or his right to counsel under the Sixth Amendment. The court then reiterated that "The sole basis of exclusion is that I do not find, once again, that there was a clear waiver of his Fifth Amendment right[] and that is why I'm excluding it." The court rejected defendant's arguments that the district attorney interview was tainted by the first interview, and likewise was not preceded by an effective waiver.

"In reviewing *Miranda* issues on appeal, we accept the trial court's resolution of disputed facts and inferences as well as its evaluations of credibility if substantially supported, but independently determine from undisputed facts and facts found by the trial court whether the challenged statement was legally obtained." (*People v. Smith* (2007) 40 Cal.4th 483, 502 [54 Cal.Rptr.3d 245, 150 P.3d 1224].) Whether defendant invoked his rights under *Miranda* is a question of fact to be resolved on the basis of the totality of the circumstances. (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1238 [74 Cal.Rptr.2d 212, 954 P.2d 475]; *People v. Hayes* (1985) 38 Cal.3d 780, 784–785 [214 Cal.Rptr. 652, 699 P.2d 1259].) Defendant contends his "I don't have a side of the story" and "I don't want to talk about it" statements must be treated as invocations of his *Miranda* rights.

 But invocations cannot be equivocal or ambiguous. (*Berghius v. Thompkins* (2010) 560 U.S. ___ [176 L.Ed.2d 1098, 130 S.Ct. 2250, 2259–2260]; see *People v. Crittenden* (1994) 9 Cal.4th 83, 129 [36 Cal.Rptr.2d 474, 885 P.2d 887] ["we apply federal standards in reviewing a defendant's claim that his or her statements were elicited in violation of *Miranda*"].) Having viewed the tape, and reviewed the testimony given in connection with defendant's suppression motion, we conclude that there is substantial evidence from the totality of the circumstances supporting the trial court's implicit finding that neither statement constituted an unequivocal invocation.

Although the premise of *Miranda* is that custodial interrogation is deemed inherently coercive (e.g., *United States v. Patane* (2004) 542 U.S. 630, 639 [159 L.Ed.2d 667, 124 S.Ct. 2620]), defendant was hardly a terrified novice. When the interview session started, even before the *Miranda* warnings were given, defendant was asking whether he could speak with another officer with whom he had had prior dealings. He faults the officers for not asking questions to clarify whether he was invoking his rights, but they did precisely that: when Norton early on asked, "Are you not going to talk to us, is that what you are doing?" defendant replied, "No, I'm talking to you guys." Defendant's "I don't have a side of the story" statement strikes us as, at best, inherently ambiguous. It obviously could mean that he had no explanation ("story") that was exculpatory.

██ Defendant's claim that his first statement was the product of the officers' implied promise of "help"—which defendant equates with leniency—is to be reviewed according to well-established standards: "The federal and state Constitutions both bar the use of involuntary confessions against a criminal defendant. [Citations.] A confession is involuntary if it is 'not " 'the product of a rational intellect and a free will' " ' [citation], such that the defendant's 'will was overborne at the time he confessed.' [Citation.] In assessing allegedly coercive police tactics, '[t]he courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable.' [Citation.] Whether a statement is voluntary depends upon the totality of the circumstances surrounding the interrogation." (*People v. Smith, supra,* 40 Cal.4th 483, 501.) " 'The question posed . . . in cases of claimed psychological coercion is whether the influences brought to bear upon the accused were "such as to overbear petitioner's will to resist and bring about confessions not freely self-determined." [Citation.]' [Citation.]" (*People v. Thompson* (1990) 50 Cal.3d 134, 166 [266 Cal.Rptr. 309, 785 P.2d 857].)

Concededly, defendant was crying during the first 10 to 15 minutes, prompting one of the officers to urge defendant to "Take a couple of deep breaths and try to compose yourself." It worked, if only temporarily. Defendant resumed crying when confronted with a picture of the victim. While defendant reads an implied promise of leniency into Officer Kelly's statement that "[w]e are here to listen and then to help you out," and Officer Norton's statement that "the court . . . wants to know what the real story is and you're the only one that can provide that," our review of the videotape reveals that the only benefits promised by the officers was the peace of mind defendant and others would have after he did the right thing and gave his side of the story. That is not coercion. (E.g., *People v. Williams* (2010) 49 Cal.4th 405, 444 [111 Cal.Rptr.3d 589, 233 P.3d 1000]; *People v. Boyde* (1988) 46 Cal.3d 212, 238 [250 Cal.Rptr. 83, 758 P.2d 25] ["Mere advice or exhortation by the police that it would be better for the accused to tell the truth, when unaccompanied by either a threat or a promise, does not . . . make a subsequent confession involuntary."]; *People v. Jimenez* (1978) 21 Cal.3d 595, 611–612 [147 Cal.Rptr. 172, 580 P.2d 672] [" '[when] the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct,' the subsequent statement will not be considered involuntarily made."]; *People v. Andersen* (1980) 101 Cal.App.3d 563, 578 [161 Cal.Rptr. 707].) The brief and bland references upon which defendant has seized do not push this case over the forbidden line of promised threats or vowed leniency (see *People v. Ray* (1996) 13 Cal.4th 313, 340 [52 Cal.Rptr.2d 296, 914 P.2d 846]), certainly not within the context of an interview that lasted more than three hours.

Certainly defendant experienced stress. It may have been realization of the seriousness of his situation, or remorse at what he had done.[16] Defendant's repeated and resigned expressions that "in the end it really doesn't matter," and "What does it matter I'm . . . going to prison for the rest of my life," betray a deep pessimism about the criminal justice system. Even if defendant in good faith was insisting that he left Prasad alive, he was now confronted with the reality that the choking of Prasad had led to his death. Undoubtedly, Officers Norton and Kelly used planned techniques, interrogation ploys, and even mock flattery ("It takes a big man to be honest," "You're doing the right thing. I'm proud of you," "you were very honest with us"), during the course of the interview. Yet, there are long periods of unforced lucidity by defendant. If defendant was not particularly forthcoming with volunteered details, he nevertheless followed questions posed, and generally provided answers, even if the question had to be reiterated. The questioning was insistent, but not intrusive or overbearing. There was a break of almost 40 minutes when defendant was left alone in the interview room. Defendant's body language was not cowering. Defendant was wearing handcuffs only until the interview was about to begin, when they were removed. He was able to assert himself and challenge the logic of the officers' assumptions, i.e., "I don't care what you think," "what I think you're doing right now, you're analyzing too much," "I don't care if you believe me or not." And, ultimately, the officers failed on the crucial point—defendant doggedly insisted Prasad was alive when he left, and he adamantly denied that he pushed Prasad off the road and down the canyon ravine.

Granted, defendant made statements after June 2 that were recorded, and which will bear an incriminating inference. The general import of the statements is that a week after June 6—after he knew that Prasad was thought missing by his family, who were trying to locate him—defendant either assumed or knew that Prasad's body was still in Palomares Canyon, and that it would have the zip ties which should be removed. However, the inference that defendant now knew Prasad was dead, is still not inconsistent with the defense theory that there was no murderous intent on the night of June 2. In other words, defendant could have concluded that his actions did result in Prasad's death, but this does not demonstrate that the death was intentional.

---

[16] When initially offered a photograph of the victim, defendant insisted that "I don't want to see him, please don't show it to me." When later forced to look at the photograph, defendant once more broke down in tears, insisting, "I don't want to be alive no more." And even later in the interview, when Officer Norton made reference to the photograph of Prasad, defendant insisted, "I don't want to see it again." At that point Officer Kelly bluntly told defendant that Prasad "died at the hands of another and those hands were yours, and you have to face up to that, you killed another human being, you killed somebody," and then Prasad's "family that's never going to see him again, they don't even know yet . . . that he's dead . . . . What am I going to tell his mother cause him [(Norton)] and I are going to tell his mother. What do we tell her? Give me an idea, here, man. You know how hard that is to do?"

In light of the foregoing, we conclude the trial court's pretrial ruling cannot be overturned on the basis of the record as it now exists. However, in the event of a retrial, the trial court is at liberty to reexamine this ruling in light of any new information that may be brought to its attention.

## DISPOSITION

The judgment of conviction is reversed. Pursuant to Business and Professions Code section 6086.7, subdivision (a)(2), a copy of this opinion will be sent to the State Bar for such disciplinary action, if any, it may deem appropriate.

Kline, P. J., and Haerle, J., concurred.