Filed 8/6/14  P. v. Hernandez CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOSE ENRIQUE HERNANDEZ,<br><br>    Defendant and Appellant. | A137500<br><br>(Contra Costa County<br>Super. Ct. No. 1113652) |

Defendant Jose Enrique Hernandez was sentenced to state prison for an aggregate term of 84 years to life after a jury found him guilty of ten counts of committing lewd and lascivious acts on a child under the age of 14 (Pen. Code,[1] § 288, subd. (a)) and one count of attempted sexual intercourse with a child under the age of ten (Pen. Code, §§ 288.7, 664).  The court further ordered defendant to pay the two victims $1,000,000 as restitution, computed at $100,000 for each of the ten violations of section 288.

Defendant contends:  (1) the court erred in denying his motion to exclude evidence of the prearrest, noncustodial incriminating statements he made involuntarily as a result of various forms of coercion and improper influences; (2) the verdict was infected by constitutional error in two instructions concerning permissive inferences the jury could draw; and (3) the restitution was constitutionally improper and excessive.  We reject these contentions, and affirm.

---

[1] Statutory references are to the Penal Code unless otherwise indicated.

1

## BACKGROUND

Defendant does not contend that any of his convictions lacks the support of substantial evidence. The briefs filed by the parties establish their complete familiarity with the lengthy trial record. The parties' briefs further demonstrate that there is no genuine dispute regarding the nature of the evidence considered by the jury. Thus, it is unnecessary to recount that record beyond noting that the evidence fully justified the jury in concluding that, over a period of four years, defendant continually abused the first victim (Jane Doe I), commencing when she was barely four years of age. The evidence further proved that thereafter defendant molested a second victim for a far briefer period.

## NO ERROR IN THE DENIAL OF THE SUPPRESSION MOTION

Prior to trial defendant moved to exclude evidence of custodial statements he made to Contra Costa Sheriff's Detective Shabazz during the course of four interviews. The motion—actually three motions heard together—was the subject of an evidentiary hearing, at the end of which the trial court declined to order suppression. The motions were made on a number of grounds, only one of which is renewed here—that his statements should be found to have been made involuntarily. Defendant's motion offered four reasons for finding the statements involuntary: (1) appeals to defendant's religious beliefs; (2) threats of increased charges and offers of leniency; (3) appeals to defendant's fear of losing his daughter; and (4) falsely representing the strength of the evidence against defendant. Defendant reiterates these four points.

"The federal and state Constitutions both bar the use of involuntary confessions against a criminal defendant. [Citations.] A confession is involuntary if it is 'not " 'the product of a rational intellect and a free will' " ' [citation], such that the defendant's 'will was overborne at the time he confessed.' [Citation.] In assessing allegedly coercive police tactics, '[t]he courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable.' [Citation.] Whether a statement is voluntary depends upon the totality of the circumstances surrounding the interrogation.' [Citation.] ' "The question posed . . . in cases of claimed psychological coercion is whether the influences

2

brought to bear upon the accused were 'such as to overbear petitioner's will to resist and bring about confessions not freely self-determined.' [Citation.]" [Citation.]' [Citation.]" (*People v. Vance* (2010) 188 Cal.App.4th 1182, 1212.)

"No single event or word or phrase necessarily determines whether a statement was voluntary. The answer must be derived from the totality of the facts and circumstances of each case, keeping in mind the particular background, experience and conduct of the accused." (*People v. Kelly* (1990) 51 Cal.3d 931, 950.) "We review independently a trial court's determinations as to whether coercive police activity was present and whether the [accused's] statement was voluntary." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1093.)

At the hearing on defendant's motions, the court heard testimony from Detective Shabazz, who testified as follows. The first interview took place on March 28, 2011, at defendant's request, in his work vehicle while it was parked in the lot of a Starbucks. Shabazz told defendant he (defendant) was not under arrest and would not be arrested that day. The interview lasted less than 50 minutes because Shabazz met defendant during the latter's lunch break. The interview was terminated because Shabazz was "trying to accommodate him . . . I knew he had to go back to work." As a "ruse," Shabazz falsely told defendant "There was a lot of DNA evidence that was located on the victim's clothing. And that I planned on returning with a search warrant to get his DNA to compare." The ploy was unsuccessful: "the whole first interview was basically a denial."

The second interview took place the following day, March 29, again during defendant's lunch break, and again in defendant's work vehicle. This time they were in the parking lot of a public park. Again Shabazz told defendant he was not under arrest and would not be arrested that day. As another "ruse," Shabazz showed defendant a blank search warrant affidavit as ostensible authority for obtaining a DNA sample from defendant, which Shabazz purported to take ("I actually went through the process of giving him Q-tips . . . which he wiped inside his mouth," and then "threw them away as trash"), using "an official DNA collection kit." Defendant was not given the option of

3

not providing a swab sample. Again, the interview lasted less than an hour. During the interview, defendant admitted orally copulating Jane Doe 2.

The third interview took place on April 19. Like the previous interviews, it took place in defendant's work vehicle, on his lunch break, and lasted less than 50 minutes, again while the vehicle was parked at the public park. Although Shabazz gave defendant *Miranda* warnings, he also told defendant that he was free to leave at any time, and "no matter what . . . , he would not be arrested that day. This time defendant "confessed to some ongoing sexual abuse of [Jane Doe I]."

The fourth and final interview took place in defendant's vehicle at the same park two days later, on April 21. Again Shabazz gave defendant *Miranda* warnings. Defendant then agreed to speak with Shabazz. Again defendant "confess[ed] to sexual activity" with Jane Doe I. Shabazz arrested defendant.[2] Shabazz testified that he made no threats or "offers of leniency" to defendant in any of the interviews. He met defendant at the places defendant specified because "He did not want these interviews to be conducted anywhere near his family."

The trial court listened to recordings of the four interviews and reviewed transcripts of the recordings. We have also reviewed the transcripts.

The transcript of the first interview corroborates Shabazz's testimony in all significant particulars. That interview was "basically a denial" by defendant. Defendant was told "no matter what we talk about today, . . . I'm not going to arrest you today." Shabazz did tell defendant that police had "positive hits on DNA," and "I just don't have the . . . matching DNA which most likely is the perpetrator that she's claiming is you. So my next step is I'm gonna be writing a search warrant to get your DNA."

Shabazz told defendant: "There's a difference between child molest and someone who has done a few things that are just batteries—they've actually touched on a child inappropriately . . . . Child molest is something where's there's actual—we're talking

---

[2] Detective Shabazz had no further contact with defendant until a fifth interview was initiated by defendant on April 25. This interview was not addressed by defendant's suppression motion.

4

about sexual intercourse, all right?  Where penis goes inside the vagina."  Defendant was urged to speak honestly, "[b]ecause if not then when I go to the DA's office I'm gonna get a search warrant for your DNA and it's gonna be a closed book and there's no way going back."  Shabazz also told defendant that "My goal is to try to help you and get some type of therapy going.  That's what my goal is."

The subject of religion was introduced by defendant when he recounted a previous accusation made by his former wife:  "they took my word and . . . [¶] I never came back to court.  So, . . . after that I'm a big believer and I know he's there for me.  [¶] So that's why, . . . every time . . . they come to this kind of problems, . . . I pray a lot . . . [¶] because, you know, he's the only one that knows."

Defendant continued:  "[L]ike I say I pray a lot and I can say God was on my side.  And he helped me out and that's why I'm here.  So right now this is the . . . same thing too.  I'm gonna leave everything in his hands because he's the one that knows, you know.

"Have you heard—ever heard of the saying where, you know, I forget who it was and what scripture it was but basically the man was standing on the corner in a desert and, uh, basically he wanted to make it home.  He was starving: he wanted food and he needed water.  All right?  On two different occasions women passed by.

"But his pride was too good and he wouldn't accept the food and the water from the women.  Okay?  And he prayed to God as to why God would not give him the ability to find his own food and find his own water.

"Well God told him I sent two women to bring you food and bring you water.  Okay?  Sometimes you gotta think about the reason God is working through people.

"All right? And I am religious and I do believe in God."

Shabazz then told defendant he had spoken with Jane Doe I "and she still maintains those allegations.  Defendant seemed incredulous:

"She's still maintaining?  Wow.  I mean . . .

"SHABAZZ:  You do understand that.  Now God sends people . . . .

"I've been waiting for her, you know, to—I don't know.

5

"SHABAZZ:  This is how—this is how—and I can talk from experience.  If you're waiting to try to reunify with your daughter—with your family—if you're waiting to try to work things out the first step is to be honest and tell the truth.  From that you may get in a little trouble.  Then you take care of the trouble that you have that's in front of you.  God's gonna help you get through that.  After that you start rebuilding what you had with your family. . . .  [¶] . . .[¶]

"Listen.  You come off to me as my brother . . . . I don't normally bring in religion.  Okay?  I'm religious but if you're gonna talk to me and you're gonna be religious with me and you're gonna talk about God then let's talk about God.  Let's talk about being honest and telling the truth.  All right?  I'm gonna be honest with you.  I'm not gonna reach out to anybody like this.  I don't reach out and feel this that you are my brother right now.  But if you are—if you're saying that you're speaking from God and you think God is helping through you then I feel that you're my brother and we need to work through this . . . ."

When defendant insisted "I'm telling you the truth," Shabazz replied:  "[Y]ou're not.  We talked about this.  You're at the doors.  You're at that crossroad, okay?  You're talking about God. [¶] . . . [¶] [I]f you're saying that God is the only one who knows then fine.  But I want you to know I know as well.  And I just want you to be honest about it.  God is gonna get you through this.  No matter what issues you have God is gonna get you through this."

Later, when defendant was still denying anything improper, Shabazz told him: "[A]bout 30 minutes ago I probably would've walked out of this truck.  But you telling me you're a God fearing man I just don't feel right leaving without you being honest with me," and "my reasons for continually talking to you is that you're saying you're a God fearing man . . . You making a few mistakes that's nothing serious to me.  I'm not judgmental.  That's something between you and your God."

A few minutes later, after reiterating that "I'm definitely coming back to get your DNA," Shabazz told defendant:

6

"I'm gonna tell you something and I want you to be—I want you to understand this. All right? When I met you and when you told me, uh, after a few minutes of talking I was gonna get out of the truck 'cause I figured you just were gonna lie. All right? But when you told me you're a God fearing man I figured sooner or later you'd tell the truth. Okay. Here's—here's the deal. Um, you're being a God fearing man there's gonna come a time when you're gonna have to meet with God. [¶] . . [¶] And answer to what you've done, all right? You're gonna need to set—set the record straight beforehand. And it's not gonna work by you just repenting. And I'll tell you right now I'm definitely not—I don't liken myself to God's soldier coming out here trying to help you. Okay? But I do know that certain things God sets before people for a reason. And this is a— what is this a second chance or a third chance that someone's given you—God has given you a chance to be honest about this whole thing. I don't know if you're truly a brethren or if you're not. But that's what going on."

And later, "you're not helping them [the victims] by not telling the truth. . . . That actually hurts my heart because you're saying you're a God fearing man and you don't wanna hurt—don't wanna hurt these children."

When Shabazz asked if he was scared, defendant replied "I would leave everything to God." Shabazz then told defendant: "That's the thing. You're not leaving everything to God. You're not being honest about this whole thing." As the interview was about to end, Shabazz again told defendant: "I would've left this car a long time ago but you had to tell me that you're—you been going to church and you're a God loving—a God fearing man. That's gonna hurt me personally if I have to get on the stand and I see you there there's a chance that you could've just told me the truth." And a minute or two later, Shabazz asked "what church do you go to?" Defendant replied: "Uh, I—I—right now (unintelligible) Catholic but . . . [¶] . . . [¶] my mom and dad they're like Mormons. . . . [¶] . . . [¶] So, uh, right now I haven't attended, you know, to a church but, uh, I do believe." The interview ended with Shabazz telling defendant he attended a Baptist church, that "next time I come . . . I'm gonna be coming to get your DNA," and

the "only reason why I continue talking to you is you're saying you're brethren—you're a brother of God."

The second interview the following day commenced with the charade of the DNA extraction. Detective Shabazz quickly returned to the religious theme: "[W]hen the cases are this strong, . . . when the DA's office says just bring in the filing, uh, I don't bother, right? Ask you a few questions and if people want to continue lying, I just let it go. But you, uh, see I go to church . . . . [¶] . . . [¶] And if you're gonna come to me as your brethren and you're telling me that you're a brother and you're a God fearing man . . . [¶] . . . [¶] then its—I feel it's my duty to make sure that you are gonna be honest with us . . . ."

Moments later Shabazz told defendant, "I'm glad you feel I'm a nice person because trust me, I am being a nice person because I generally like talking to you. And . . . [¶] . . . [¶] the fact that you're saying you're a brother just like me and you believe in God, then that makes . . . [¶] . . . [¶] me even stronger about talking to you."

Later, Shabazz cut off defendant's denials:

"SHABAZZ: Stop. Stop. You and I both know what's going on here. You and I both know you need some help, all right?

"DEFENDANT: Oh. Okay.

"SHABAZZ: Today is the day of repentance because the kingdom is near.

"DEFENDANT: Uh-huh.

"SHABAZZ: That's Matthew 4:17.

"DEFENDANT: Oh yes sir. Yes.

"SHABAZZ: All right?

"DEFENDANT: Uh-huh.

"SHABAZZ: The kingdom is near whether you know it or not. I don't know how religious you say that you don't go a lot.

"DEFENDANT: No, yes.

"SHABAZZ: But whether you—the kingdom is near and you're gonna have to repent and make—make amends with this. And the first way to make amends is making

8

amends with [victim's name] and making amends with, uh, whoever else you had issues with. I'm here because now not—I came—I came to you yesterday for the first 15 minutes. That was for [victim's name], okay?

"DEFENDANT: Uh-huh.

"SHABAZZ: After that me talking to you was for you.

"DEFENDANT: Okay."

Later, apparently to encourage defendant to keep talking, Shabazz told him: "I already know you made a mistake. If . . . I didn't know, I wouldn't be here talking to you . . . . [¶] . . . [¶] And if you hadn't said anything about God yesterday I wouldn't . . . [¶] . . . [¶] be sitting, talking to you."

Minutes later, pushing defendant to admit improprieties, Shabazz told him "I've . . . given you an extra day to talk to me about it because I figured you seemed like you had good in your heart when you talked about God. . . . I'm starting to think you don't have any good in your heart." Shabazz continued: "[To] be honest, I'm actually starting to feel like you're the type of person that actually doesn't matter whose child it is, that you're actually out there hunting for kids. [¶] . . . [¶] . . . And when I put you in that category, you're gonna have a hell[ of ]a problem." To which defendant responded, "I believe in God," and then repeated "I believe in God a lot."

After defendant admitted "I did put my mouth . . . on her vagina . . . [¶] but that's the only thing," Shabazz continued to press, telling defendant "You will feel so much better once you just get this off your chest." Defendant admitted "I want to put a stop to this," Shabazz told him: "Well, in order to put a stop to this, you need to get some help. . . . [¶] . . . [¶] In order to get that help, you're gonna have to start by just being honest with me . . . [¶] . . . [¶] I want you to get some help from therapists . . . [¶] . . . [¶] I want the DA, I want the social workers, I want the judges to know that you need help. [¶] . . . [¶] That's what I want. I'm trying to get that for you."

After defendant had made a partial confession, Shabazz responded, "Don't you feel better just telling me the truth about everything?," and "I know that was hard for you to tell me but . . . that's the first step." Shabazz ended the interview by telling defendant:

9

"I'm a man of my word, like I told you before. I'm gonna walk out of here . . . And I'm gonna try to arrange to make sure you the kind of help that you need."

The third interview took place three weeks later, on April 19. After some opening pleasantries, Shabazz told defendant "there are some things that I need to address with you," and then "I know you're the victim in this whole thing." He also told defendant "But you being an honest man, knowing that you made a mistake and you're trying to correct yourself . . . [¶] . . . [¶] that's gonna make things a lot better for you in the long run."

Defendant stated "the first time I talked to you, uh, I told you I don't believe in God . . . I prayed that night" and listened to "Christian radio." "Yeah, and, uh, I'm—right now honestly like I said I don't follow any churches but I—I really believe in God [¶] . . . [¶] . . . And I started reading the Bible too and, uh, right now I'm on the fourth book, . . . [¶] . . . I read Genesis, Exodus and I've been learning so much things About it and I feel really bad now, you know, not only because, you know, my family . . . [¶] I mean I wish, you know, all those things before, you know . . . [¶] . . . [¶] but you know, how—like I said, whatever is gonna happen, I mean, you know, I gotta accept I—I did a mistake."

At this point defendant started crying, which Shabazz told him "that makes me feel good to know that you're trying to make yourself a better man." Defendant responded: "No, and—and that's the thing because, uh, you came to me and—and the way you did it is like, you know, you—you—like you—you know, it make me reflect or something, you know. . . . [¶] . . . [¶]The—and you—you helping me though. And those days, you know, God can come to you as a friend, uh, as a neighbor or somebody, or send, you know an angel and I—I see you like that." Shabazz replied: "God works in mysterious ways, Enrique."

Shabazz then returned to the details of defendant's "mistake," because "I wanna make sure that when I present this to the DA's office and everyone gets Social Services, therapists, judges, courts, jury, all these people when they find out what's going on that they heard the whole truth." When defendant admitted molesting Jane Doe II, he told

10

Shabazz he asked for God's forgiveness: "I need to . . . feel better . . . , you know, not only with you guys, with my daughter, with my family, with God."

Later, after recounting some incidents in graphic detail, defendant told Shabazz: "I'm gonna be reading the Bible, man, trust me I mean I'm gonna be changing a lot because . . . I've been feeling so bad, you know, . . . now that I've been reading the Bible and I'm like—I wish I could know all these things." Shabazz responded by repeating that "God is the only one who will know the reason why" and who alone could judge defendant.

About five minutes later, Shabazz gave defendant *Miranda* warnings. Shabazz did not seek a waiver of those rights, but he did reiterate "you're not going to jail today." Shabazz then retraced "some things that we talked about in the past couple of days." The interview was about to end when Shabazz asked whether defendant felt sufficiently depressed that he might take his own life "cause that's the biggest sin." Defendant denied such an intent, thanks in part to listening to Christian radio and reading the Bible. Defendant was now "confident in God."

The fourth and final interview, two days later, on April 21, opened with Shabazz again giving defendant *Miranda* admonitions. Then, because "[t]here are a few things I want to go over with you," Shabazz began reviewing and reconfirming defendant's admissions in the three prior interviews. At one point defendant insisted to Shabazz: "I'm telling you exactly . . . what happened . . . the only witness I have is God."

The following exchange occurred near the end of the interview:

"SHABAZZ: Have you been still what, listening to the, um . . .

"DEFENDANT: I'm—I'm listening to that.

"SHABAZZ: . . . to the Christian music? The Christian chur—channel?

"DEFENDANT: Yeah, I am.

"SHABAZZ: Is it Pastor, uh (David O. Livingston)?

"DEFENDANT: I think that's what his name is, yeah.

"SHABAZZ: (Livingston)? That's his name?

"DEFENDANT: Un-huh.

11

"SHABAZZ: You've been watching it?

"DEFENDANT: I've been listening to it, yeah. And I've been (unintelligible) . . .

"SHABAZZ: He's a good pastor. He's a good preacher on the radio, (David O. Livingston).

"DEFENDANT: Yeah. I know.

"SHABAZZ: Okay.

"DEFENDANT: I know. And trust me—like I say, I mean I—I never wanted, you know to cause this pain, you know, to my daughter?

"SHABAZZ: What does , (David O. Livingston) talk about on—on the radio when you're listening to it.

"DEFENDANT: What—what is his . . .

"SHABAZZ: What does—what does . . .

"DEFENDANT: . . . (unintelligible) . . .

"SHABAZZ: . . . he speak about?.

"DEFENDANT: Redemption.

"SHABAZZ: The Christian?

"DEFENDANT: To—to redemption there is, you know, to follow God, you know? Not to just, you know, one time, you know, to go look for him, you know? If you're thirsty about him, you know . . .

"SHABAZZ: Mm-hm.

"DEFENDANT: . . . go for it. And . . .

"SHABAZZ: What channel it on?

"DEFENDANT: It's 1100 from AM.

"SHABAZZ: AM? Okay.

"DEFENDANT: And it's—it's really helping me right now.

"SHABAZZ: It's helping you? These are gonna be hard times, all right?

"DEFENDANT: Yeah."

Defendant was then taken into custody.

12

## Appeals To Religious Beliefs

" '[T]he tactic of exploiting a suspect's religious anxieties has been justly condemned.' [Citation.] When police comments are not 'calculated to exploit a particular psychological vulnerability of [the] defendant,' however, and 'no acute religious anxiety or sense of guilt is apparent from prior questioning,' appeals to religion are unlikely to be a motivating cause of a defendant's subsequent confession." (*People v. Carrington* (2009) 47 Cal.4th 145, 176, quoting *People v. Kelly*, *supra*, 51 Cal.3d 931, 953.)

Detective Shabazz testified that the matter of religion was raised by defendant at the first interview. Asked "what did you think when you heard him talking about religion?," Shabazz answered: "As soon as he brought that up, I knew that that was going to be a way to build rapport with him. A way for him to trust me more and a way for me to find out the truth."

Defendant contends that building that rapport led to a coerced confession: "Knowing that appellant was vulnerable to a religious argument, Shabazz relentlessly pushed him on religious grounds throughout the four interviews." The trial court concluded that coercion and involuntariness had not been established. On our independent review, we reach the same conclusion.

The most significant consideration is that we are not dealing with custodial interrogation. Far from it. Nor are we considering the attritional impact of a single extended interrogation where the accused is deprived of relief or respite. We are instead considering four discrete interviews held over more than three weeks, and each lasting less than 60 minutes. All of those meetings were arranged and held at defendant's convenience, in his vehicle, at a public place of his choosing. (See *People v. Duff* (2014) 58 Cal.4th 527, 555-556 [totality of circumstances includes "the length, location, and continuity of the interrogation"].) Moreover, at the first three meetings, defendant was expressly told that he was not under arrest and was not going to be arrested that day. At the last two meetings he was given *Miranda* warnings. (See *People v. Holloway* (2004) 33 Cal.4th 96, 115 [" 'Once a suspect has been properly advised of his rights, he may be

questioned freely' "]; *People v. Williams* (1988) 44 Cal.3d 1127, 1142 ["*Miranda* warnings serve to dispel the coercive effect of police custodial questioning"].)

The subject of defendant's religious beliefs was first raised by defendant himself at the first interview. Certainly, as Detective Shabazz testified, this knowledge was used by Shabazz to build a rapport with defendant. Just as certainly, Shabazz may have sensed that religious beliefs could be useful in getting defendant to open up. But such an approach or tactic must be the proximate cause for the statement. (See *People v. McWhorter* (2009) 47 Cal.4th 318, 347; *People v. Maury* (2003) 30 Cal.4th 342, 405; *People v. Benson* (1990) 52 Cal.3d 754, 778-779.) "A confession is not rendered involuntary by . . . police activity that is not the 'motivating cause' of the defendant's confession." (*People v. Linton* (2013) 56 Cal.4th 1146, 1176.) Shabazz's approach did not have that nexus, or a confession would have been obtained before the third interview.

### Defendant's Fears of Losing His Daughter

Detective Shabazz was asked, "Did you ever tell Mr. Hernandez that if he cooperated with you, he would be able to see his daughter?" His answer was "No, I did not." Defendant, however, contends that when Shabazz told defendant at the first interview, "If you're waiting to try to reunify with your daughter—with your family—if you're waiting to try to work things out the first step is to be honest and tell the truth," Shabazz was "prey[ing] upon appellant's sorrow over missing his daughter" and "his desire to be reunited with [her]." This ploy was effective, maintains defendant, because "within minutes . . . [he] . . . made very incriminating statements."

Shabazz never expressly stated, or even intimated, that defendant's confession would automatically result in reunification with his daughter. Quite the contrary, Shabazz was quite clear that it was merely the first step of a long process that would involve "the DA's office . . . Social Services, therapists, judges, courts, jury, all these people when they find out what's going on that they heard the whole truth." Mention of a jury would clearly imply a criminal trial with the risk of incarceration.

Defendant argues that the third interview commenced with "Shabazz . . . saying appellant's daughter is a beautiful young lady and she looks like appellant. Shabazz said

14

that [the daughter] loves appellant, and she wants to work this out and maybe be a family again, but only if appellant tells the truth." That was neither threat nor promised inducement, and thus not coercion. (See *People v. Vance*, *supra*, 188 Cal.App.4th 1182, 1212 [" 'Mere advice or exhortation by the police that it would be better for the accused to tell the truth, when unaccompanied by either a threat or a promise, does not . . . make a subsequent confession involuntary.' "].) "[M]oreover, defendant did not incriminate himself as a result of [Shabazz's] remarks. [Citations.] Rather, defendant continued to deny responsibility in the face of [Shabazz's] assertions." (*People v. Williams* (2010) 49 Cal.4th 405, 444.) That is hardly the response of someone whose will has been overborne. (*People v. Vance*, *supra*, at p. 1212.)

### Defendant Was Not Improperly Deceived

Defendant's next ground for excluding his statements is that Detective Shabazz elicited them by fabricating the supposed DNA "evidence," and by falsely telling defendant that one of the victim's stories had been corroborated. Police trickery, particularly lying and deceiving a defendant about the state of the evidence, are permitted practices unless they are " ' " 'of a type reasonably likely to procure an untrue statement.' " ' [Citations.] ' "The courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable." ' " (*People v. Williams, supra,* 49 Cal.4th 405, 443.) If defendant's estimation of Shabazz's "ruses" was correct—particularly the DNA swab—one would expect him to pretty much crack or fold immediately in the face of imminent and inexorable scientific doom, but he did not. (*Id*. at p. 444.) Thus, we conclude that here too that the deception was not the proximate cause of defendant's eventually confessing.

15

**Defendant Was Not the Victim of Threats or
Promises of Leniency**

Defendant's final argument is that he was whipsawed between Shabazz's promise of leniency in confining defendant's consequences to therapy ("My goal is to try to help you and get some kind of therapy going") and the detective's threat that if he did not confess, he would be pegged as a child molester ("And when I put you in that category, you're gonna have a hell[ of ]a problem")

Viewed in isolation, Detective Shabazz did make some remarks that might bear an unfortunate construction. However, unlike defendant's approach, out independent review has to take account of the totality of the almost 200 pages of transcripts from the four interviews. (*People v. Duff*, *supra*, 58 Cal.4th 527, 555-556; *People v. Kelly*, *supra*, 51 Cal.3d 931, 950; *People v. Vance*, *supra*, 188 Cal.App.4th 1182, 1212.) Our review of those pages shows that Shabazz never came close to promising that the aftermath of a confession would be limited to therapy, that there would be no criminal charges. Quite the contrary. Indeed, far more frequent, were the detective's reminders that many other actors would be involved. The threatened DNA extraction would occur because Shabazz would "go to the DA's office" and "get a search warrant." Thus, defendant was on notice that the ultimate decision did not reside with Shabazz. It is also important to note that defendant's argument rests on statements made by Shabazz at the first and second interviews, which appear to have were voluntarily initiated by defendant, which occurred in a noncustodial setting of defendant's choosing, and which commenced with Shabazz telling defendant he was not under arrest and would not be arrested that day. It was not until the third interview, which was three weeks later, that defendant began to acknowledge wrongdoing and admit to committing criminal acts. The chronology does not comport with Shabazz's earlier comments constituting the "motivating cause" of defendant making an untrue confession. (*People v. Linton*, *supra*, 56 Cal.4th 1146, 1177; *People v. Williams*, *supra*, 49 Cal.4th 405, 443.)

16

## NO INSTRUCTIONAL ERROR OCCURRED

The trial court instructed the jury with CALCRIM Nos. 362 and 371, as follows:

"If the defendant made a false or misleading statement before the trial relating to the charged crime, knowing the statement was false or intending to mislead, that conduct may show he was aware of his guilt and you may consider it in determining his guilt. [¶] If you conclude that the defendant made the statement, it is up to you to decide its meaning and importance. However, evidence that the defendant made such a statement cannot prove guilt by itself."

"If the defendant tried to hide evidence or discourage someone from testifying against him, that conduct may show that he was aware of his guilt. If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself. [¶] If someone other than the defendant tried to create false evidence, provide false testimony, or conceal or destroy evidence, that conduct may show the defendant was aware of his guilt, but only if the defendant was present and knew about that conduct, or, if not present, authorized the other person's actions. It is up to you to decide the meaning and importance of this evidence. However, evidence of such conduct cannot prove guilt by itself."

Defendant does not contend that the prosecution failed to present sufficient evidence of the underlying events to warrant these instructions. He does contend that the instructions concerning the jury's use of these permissive inferences violated his right to due process, specifically, that they allowed the jury to treat misleading statements or an attempt to suppress evidence not just as indicative consciousness of guilt, but as actual substantive evidence of guilt. Contrary to the Attorney General's position, defendant's failure to object to these instructions in the trial court does not preclude our consideration of the merits of his contention. (§ 1259; *People v. Taylor* (2010) 48 Cal.4th 574, 630, fn. 13.)

Defendant concedes that the substance of the instructions have repeatedly been sustained against constitutional attack by our Supreme Court. (E.g., *People v. Page* (2008) 44 Cal.4th 1, 49-52, [CALJIC predecessor of CALCRIM No. 362]; *People v.*

17

*Barnwell* (2007 41 Cal.4th 1038, 1057 [same]; *People v. Thornton* (2007) 41 Cal.4th 391, 437-438 [CALJIC predecessors of CALCRIM Nos. 362 & 371]; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 102 [CALJIC predecessor of CALCRIM No. 371]; see *People v. Nelson* (2011) 51 Cal.4th 198, 214 & fn. 9 [quoting CALCRIM No. 371 with approval.].) The CALJIC predecessors of both instructions were considered in *People v. Jurado* (2006) 38 Cal.4th 72, 125-126: "We have repeatedly rejected contentions that these standard jury instructions on consciousness of guilt were impermissibly argumentative or permitted the jury to draw irrational inferences about a defendant's mental state . . . . We see no reason to reconsider these decisions . . . . [T]he instructions . . . correctly stated the law and did not invite the jury to draw irrational inferences about defendant's mental state . . . ." And in *People v. Holloway*, *supra*, 33 Cal.4th 96, 142, the court stated: "The inferences of consciousness of guilt from willful falsehood or fabrication or suppression of evidence is one supported by common sense, which many jurors are likely to indulge even without an instruction." (See *People v. Barnwell*, *supra*, at p. 1057 ["The jury could rationally infer that defendant made a false statement to deflect suspicion from himself."]; *People v. Ashmus* (1991) 54 Cal.3d 932, 977 [same inference is "altogether justified"].)

Citing a single 1995 decision from the Ninth Circuit (*Turner v. Marshall* (9th Cir. 1995) 63 F.3d 807, 820), defendant argues that the constitutional line is crossed if an instruction allows a jury to go beyond considering fabrication or suppression as showing consciousness of guilt, and authorizes the inference to be one of substantive guilt. Assuming that such a distinction exists in California law, it was not breached by the use of CALCRIM Nos. 362 and 371. Both instructions state that the specified conduct "may show he was aware of his guilt." Both advise that the inference "cannot prove guilt by itself." True, No. 362 does instruct that the jury "may consider it in determining his guilt." The instructions must be read in their entirety, and evaluated how they would be interpreted by a reasonable jury. (See, e.g., *Middleton v. McNeil* (2004) 541 U.S. 433, 437; accord, *People v. Huggins* (2006) 38 Cal.4th 175, 192.) Defendant's construction places too much emphasis on the single phrase "you may consider it in

18

determining his guilt," ignoring that the clear weight on both instructions' language limits the substantive use of the inference, if the jury decides to draw it. We discern no "reasonable likelihood that the jury understood the instruction in the way asserted by the defendant." (*People v. Cross* (2008) 45 Cal.4th 58, 67-68; accord, *Boyde v. California* (1990) 494 U.S. 370, 380.)

" 'A permissive inference violates the Due Process Clause only if the suggested conclusion is not one that reason and common sense justify . . . .' " (*People v. Mendoza* (2000) 24 Cal.4th 130, 180, quoting *Francis v. Franklin* (1985) 471 U.S. 307, 314-315.) In addition, that construction has not sufficient heft to overcome our Supreme Court's repeated approval of the principles behind the instructions.

## NO ERROR ATTENDS THE RESTITUTION ORDER

A sentencing court is required to order victim restitution for "[n]oneconomic losses, including, but not limited to, psychological harm, for felony violations of Section 288." (§ 1202.4, subd. (f)(3)(F).) Pursuant to this directive, the trial court ordered defendant to pay the two victims a total of $1,000,000, apportioned $100,000 for each of the ten violations of section 288 found by the jury. Defendant puts forth three arguments why the restitution order should be overturned.

### Federal Constitutional Right to Jury Trial

Appellant first contends the trial courts restitution order for noneconomic damages violated his federal and state constitutional rights to a jury trial pursuant to *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*) and *Southern Union Co. v. United States* (2012) __ U.S. __ [132 S.Ct. 2344](*Southern Union*) because the sum of $1,000,000 is sufficiently large that it amounts to punishment. The Attorney General argues the merits of this contention are not properly before us because defendant did not raise it at the time of sentencing. But defendant's constitutional claim is exempt from this waiver rule. (*People v. Tully* (2012) 54 Cal.4th 952, 980, fn. 9; *People v. Vera* (1997) 15 Cal.4th 269, 276-277.)

In *Apprendi, supra,* 30 U.S. 466, 490, the United States Supreme Court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime

beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." This court has already rejected defendant's claim, insofar as based on *Apprendi*, because victim restitution does not amount to punishment. (*People v. Chappelone* (2010) 183 Cal.App.4th 1159, 1183-1184.) The subsequent decision in *Southern Union* does not require a different result.

In *Southern Union*, the United States Supreme Court held that *Apprendi* applies to the imposition of criminal fines. In that case, the defendant company had been convicted of an environmental offense, which called for a maximum fine of $50,000 for each day the relevant statute was violated. (*Southern Union Co., supra,* 132 S.Ct. 2344, 2349.) The jury had not made a specific finding as to the number of days of violation, and the trial court therefore made that finding. (*Ibid.*) The high court reversed, after holding that the trial court's factual finding as to the number of days the defendant committed the offense violated *Apprendi*. (*Id.,* at p. 2357.) As the court explained: "*Apprendi's* 'core concern' is to reserve to the jury 'the determination of facts that warrant punishment for a specific statutory offense.' [Citation.] That concern applies whether the sentence is a criminal fine or imprisonment or death. Criminal fines, like these other forms of punishment, are penalties inflicted by the sovereign for the commission of offenses." (*Id.*, at p. 2350.)

Again, the concern was with punishment. *Southern Union* does not apply "to direct victim restitution, because victim restitution is not a criminal penalty . . . . *Chappelone* has collected the numerous federal cases . . . holding victim restitution does not constitute increased punishment for crime. [Citation.] And we would note the restitution order *itself* characterizes victim restitution awards as civil. (See § 1202.4, subd. (a)(3)(B) [victim restitution 'shall be enforceable as if the order were a civil judgment'].) [¶] Federal courts have also rejected *Apprendi* challenges to victim restitution statutes because these statutes, like the one before us, carry no prescribed statutory maximum. [Citations.]" (*People v. Pangan* (2013) 213 Cal.App.4th 574, 585.)

With victim restitution, the purpose of which is full reimbursement for all losses incurred, there is no specified limit on the amount that may be awarded. (*People v.*

20

*Harvest* (2000) 84 Cal.App.4th 641, 647.)  Thus, victim restitution orders—whether for economic *or* noneconomic losses—are simply not comparable to criminal fines. Accordingly, just as there can be no *Apprendi* violation where the trial court imposes a restitution fine within the range prescribed by statute, there can be no such violation where the court orders victim restitution, for which "no maximum is prescribed." (*Southern Union, supra,* 132 S.Ct. 2344, 2353 [observing that there can "be [no] *Apprendi* violation where no [statutory] maximum is prescribed"].)

### State Constitutional Right to Jury Trial

Appellant also contends section 1202.4, subdivision (f)(3)(F), violates his right to jury trial under the California Constitution because "[c]laims of noneconomic damages from intentional torts are the type of claims to which the right to a jury trial attaches" and because "assessment of noneconomic damages is not a function of the criminal courts." Defendant acknowledges that a substantially similar claim was rejected in *People v. Smith* (2011) 198 Cal.App.4th 415 (*Smith*), but he urges us not to follow its "flawed" reasoning.  We conclude that *Smith*, and its reasoning, are compelling.  Thus, we reject defendant's argument.

"Defendant contends that, although economic damages are properly awarded at sentencing without a jury determination of the amount, noneconomic damages cannot be so awarded without violating the defendant's right to a jury trial.  He asserts that, because noneconomic damages are determined pursuant to a subjective standard, that determination must be made by a jury.  'As noneconomic damages in [section 1202.4,] subdivision (f)(3)(F) are indistinguishable from noneconomic damages in the civil trial context,' argues defendant, 'there is no rational reason why they should not be subject to the right to a jury trial under Article [I], section 28 of the California Constitution.'

"We disagree. As a sentencing order, a restitution order for noneconomic damages does not give rise to a jury trial right.

" 'In determining the propriety and amount of restitution, the preponderance of the evidence standard satisfies due process.  [Citation.]  The defendant is not entitled to a jury trial [citation] and "the requisite hearing [need not] approximate the formality of a

21

civil trial." [Citation.] ' " (*People v. Narron* (1987) 192 Cal.App.3d 724, 736–737, bracketed text in original.)

"Despite this and other authorities stating that a defendant has no right to have a jury determine restitution, defendant attempts to distinguish between restitution orders for economic damages and such orders for noneconomic damages, the latter being available only for violation of section 288. He claims that, because the determination of the amount of noneconomic damages is subjective, the jury must make that determination. But this claim has no merit because there is no basis for distinguishing jury trial rights, or lack thereof, for restitution orders for economic damages and restitution orders for noneconomic damages. In both cases, the trial court is performing a task that, in a civil case, a jury would perform.

"Defendant argues that a restitution order for noneconomic damages is indistinguishable from a civil jury award for noneconomic damages. The same can be said, however, for a restitution order for economic damages and a civil jury award for economic damages. While the restitution order and the civil jury award produce the same result (an enforceable judgment against the defendant (§ 1214, subd. (b)), they are a different means to that end, one based in the civil law, with its protections and requirements, and the other in criminal law, with its own protections and requirements. The restitution hearing, whether for economic or noneconomic damages, is a criminal sentencing hearing, not a civil trial. (§ 1202.4, subd. (f)(1); *People v. Dehle* [(2008)] 166 Cal.App.4th [1380,] 1386].)

"Therefore, contrary to defendant's argument, there is a rational reason for distinguishing restitution orders, provided for by article I, section 28 of the California Constitution and section 1202.4, subdivision (f), from the constitution's provision of the right to a civil jury trial. That rational reason is that the restitution order is part of criminal sentencing." (*Smith*, *supra*, 198 Cal.App.4th 415, 433-434.)

Although defendant attacks *Smith*, that decision goes back to *People v. Narron*, *supra*, 192 Cal.App.3d 724 for the proposition that the state jury guarantee does not extend to restitution. It has stood without challenge for close to 30 years, and has several

22

times been cited with approval by our Supreme Court. (E.g., *People v. Soria* (2010) 48 Cal.4th 58, 65, fn. 7; *People v. Martinez* (2005) 36 Cal.4th 384, 390-391, 394 ["We agree with . . . *Narron*"]; *People v. Crow* (1993) 6 Cal.4th 952, 957-958.) Defendant does not persuade us to depart from *Smith* and *Narron*.

### *Abuse of Discretion*

Defendant's final contention is that the trial court abused its discretion in fixing the amount of restitution "because it did not use a rational method of calculation" when it awarded the victims $1,000,000 in noneconomic damages. We do not agree.

"Generally speaking, restitution awards are vested in the trial court's discretion and will be disturbed on appeal only when the appellant has shown an abuse of discretion. [Citation.] . . . ' "While it is not required to make an order in keeping with the exact amount of loss, the trial court must use a rational method that could reasonably be said to make the victim whole, and may not make an order which is arbitrary or capricious." ' [Citation.] ' "When there is a factual and rational basis for the amount of restitution ordered by the trial court, no abuse of discretion will be found by the reviewing court." ' [Citation.]." (*People v. Holmberg* (2011) 195 Cal.App.4th 1310, 1320.)

In *Smith, supra,* 198 Cal.App.4th 415, 436, the Court of Appeal concluded that this standard was not applicable to victim restitution for noneconomic losses because, "[u]nlike restitution for economic loss, . . . [restitution] for noneconomic loss is subjectively quantified." The *Smith* court adopted a standard of review based on the civil jury instruction regarding noneconomic loss. ( *Id*., at p. 436, quoting CACI No. 3905A (2009 ed.) [" 'No fixed standard exists for deciding the amount of these damages. You must use your judgment to decide a reasonable amount based on the evidence and your common sense.' "]) As the court explained: "The obvious difference between the review of a civil award of noneconomic damages and a criminal restitution order for noneconomic damages is that the trial court, not a jury, makes the determination in the first instance. Even with that difference in mind, we see no reason to adopt any other standard of review. We therefore affirm a restitution order for noneconomic damages

23

that does not, at first blush, shock the conscience or suggest passion, prejudice or corruption on the part of the trial court. [¶] Admittedly, this standard is not as delimited as the review of a restitution order for economic damages. By their nature, economic damages are quantifiable and thus awards of economic damages are readily reviewed for whether they are 'rationally designed to determine the . . . victim's economic loss.' [Citation.] Noneconomic damages, however, require more subjective considerations. Thus, the different standard is justified." (*Smith, supra,* at p. 436.)

Applying this different standard, the *Smith* court held that the trial court did not abuse its discretion when it ordered the defendant to pay $750,000 in restitution for noneconomic losses to the victim who had suffered years of sexual abuse. (*Smith, supra,* 198 Cal.App.4th 415, 436.) We agree with the court in *Smith* that the standard of review for restitution orders for economic losses is not directly applicable to review of an order for noneconomic losses, which requires a more subjective analysis.

In the present case, the court ordered appellant to pay $900,000 for noneconomic losses to Jane Doe I, which works out to $100,000 for each of the violations of section 288 the jury found she suffered at defendant's hands over a four-year period. Jane Doe II was awarded $100,000 for the one conviction of section 288 against her. The court stated its reasons as follows: "You have ruined their lives, in my opinion. You have robbed them of their childhood. They will forever be affected by what you have done to them. They will not be able to have normal lives with their families. They'll probably have difficulty having sexual relations that are meaningful to them. The issue of having children will be a problem for them. They will continue to think about this until they die and I think those are very, very serious . . . crimes to have committed." The court was impressed by documentation submitted by the prosecution "on various civil cases and other criminal cases . . . and it seems to me this . . . order is completely consistent with those other cases."

Thus, the restitution order in this case does not reflect a number picked out of the air, but one that fit comfortably within compensation awarded for comparable offenses. The order before us "does not shock the conscience or suggest passion, prejudice or

24

corruption on the part of the trial court." (*Smith, supra,* 198 Cal.App.4th 415, 436.) There was no abuse of discretion.

## DISPOSITION

The judgment of conviction is affirmed.


_____
Richman, J.


We concur:


_____
Kline, P.J.


_____
Brick, J.[*]

---

[*] Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.