Filed 10/30/15  P. v. Barrowclough CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D066785 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD240761) |
| LEON BARROWCLOUGH, et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of San Diego County, Eugenia A. Eyherabide, Judge.  Affirmed.

Leonard J. Klaif, under appointment by the Court of Appeal, for Defendant and Appellant Leon Barrowclough.

Athena Shudde, under appointment by the Court of Appeal, for Defendant and Appellant Terri Renee Babin.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Brendon W. Marshall, Deputy Attorneys General, for Plaintiff and Respondent.

In a dependency proceeding, D.B. was placed for potential adoption with his uncle and aunt, defendants Leon Barrowclough and Terri Babin. As a result of defendants' conduct during this placement, a jury convicted Babin of torture, attempting to dissuade a witness, false imprisonment, and assault; she was sentenced to a determinate term of eight years four months, followed by a consecutive term of life with the possibility of parole. The jury convicted Barrowclough of felony child abuse and false imprisonment; he was sentenced to an aggregate term of six years. On appeal, Babin contends the trial court erred by instructing the jury that child abuse is a lesser included offense of torture and by denying her motion for a mistrial after the prosecution's medical expert briefly teared up while she testified. Both defendants contend the trial court erred by failing to stay the sentences on certain of their convictions. We conclude that although the trial court committed instructional error as to Babin, it was not prejudicial; we reject defendants' remaining challenges and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

*The Prosecution Case*

In May 2009, when D.B. was five or six years old, he was removed from his parents' custody and placed in the care of his aunt and uncle—defendants—who planned to adopt him. Defendants had four other children: T.B., who was about D.B.'s age; Ka.B., who was three years older; H.B., who was younger; and K.B., a baby. Babin was a stay-at-home mother who hosted an Internet "blog" that gave parenting and child

2

nutrition advice.  Barrowlcough worked as a painter.  The family lived in a house behind the primary residence owned by the mother of one of the defendants.

When D.B. first moved in, he was treated well and thought things were fine.  He wanted to be adopted.  However, when D.B. was seven or eight years old, defendants began punishing him much more severely than the other children.  They also fed him less, gave him different kinds of food, and ordinarily would not allow him to eat with the family.  Defendants rebuffed D.B.'s requests for more food.  As a result, D.B. was always hungry and grew weak and tired.  D.B. estimated defendants deprived him of food for about one year.

D.B. began stealing food at school because he was not getting enough at home. He also snuck food into his room from the kitchen late at night, even after defendants installed locks on the kitchen cabinets where they kept food.  Sometimes Ka.B. secretly fed D.B.; she was reprimanded and hit if caught.

D.B. ultimately got in trouble for stealing food at school and Babin began homeschooling him.[1]  Babin initially disciplined D.B. by putting him in "timeouts," during which he would stand facing the corner of a room for anywhere between one hour

---

[1]     D.B. thought he was homeschooled for about one year, but was not sure because Babin did not really teach him anything—she was busy babysitting other children at the time.  The jury acquitted Babin of child abuse in connection with one of those children, N.M., whom D.B. testified Babin hit and put in a closet when she cried.

and a few days at a time.2  Defendants also handcuffed D.B.'s ankle to the railing of his

top bunk bed to keep him from sneaking food.  D.B. said he was handcuffed nearly all

day for approximately six months.

D.B. learned to pick the lock on his handcuffs and sometimes snuck out of bed,

unlocked the kitchen food storage cabinet, binged on food, and handcuffed himself back

to his bed to avoid detection.  He was getting weaker and was afraid he would starve.

When Babin discovered D.B. had snuck food, she punched, kicked, and elbowed him in

the stomach; beat him with broken clothes hangers and keys; tripped him; strangled him;

and slammed his head.  She also hit his upper body with full jugs of laundry detergent.

When D.B. tried to defend himself by curling into a ball and holding up his hands, Babin

responded by beating his hands.  On one occasion, Babin kicked D.B.'s hand, breaking a

bone.  Barrowclough was usually at work when Babin engaged in this type of conduct,

but when he did see it happen, he unsuccessfully attempted to intervene.  The beatings

made D.B. "want [to] die."

Because D.B. was handcuffed to the bed for most of the day and night, he could

not go to the bathroom.  When he urinated in his bed, defendants removed his clothes and

bedding and made him lay on the wet mattress.  One morning, after D.B. had laid on the

soaked mattress all night, Babin poured ice water over him.  He recalled other times

when Babin poured water on him in the morning.  Babin would not allow D.B. to get up

---

2    By contrast, the other children's timeouts lasted only as many minutes as they were
years old.  Thus, for example, if D.B. received a timeout when he was eight years old, it
should have lasted only eight minutes.

and dry himself; she punched him when he tried. At some point, defendants covered the mattress with plastic and gave D.B. only one bed sheet. D.B. tore a hole in the plastic so he could climb under it to stay warm.

Due to the bed wetting, defendants made D.B.—then about eight years old—wear diapers, which caused him to sit in his own excrement. More than once, Babin force-fed D.B. excrement from his and baby K.B.'s diapers, calling him " 'feces boy.' " She also forced what he thought was a urine-soaked sock into his mouth.

During one family trip to Big Bear, D.B. was sitting in the back row of the car near the food for the trip. He removed a frozen pizza from an insulated bag and began eating it. He was hungry because he had not been given breakfast that morning like the other children had. When one of the other children in the car told Babin, she climbed from the front seat into the back of the moving vehicle and shook and hit D.B. because it was her favorite pizza.

Defendants brought D.B.'s handcuffs on the Big Bear trip and handcuffed him to his bed there. During the middle of one night, D.B. called out for someone to unlock him so he could go to the bathroom. When no one did, he defecated in his diaper. The child of a family friend who was staying in D.B.'s room summoned Barrowclough, who was up talking with friends. Barrowclough went to D.B.'s room but did not clean him up or unlock him so he could clean himself. Instead, Barrowclough returned to his friends and waited until the following morning to unlock the handcuffs so D.B. could clean himself.

D.B. became progressively angrier with what was happening to him and acted out in various ways.[3] He also ran away at night to search for food. Barrowclough always found him and brought him home, whereupon he would put D.B. in the bathtub where Babin would spray him with cold water from a diaper sprayer attached to the toilet. Sometimes Babin put cayenne pepper in D.B.'s eyes. Other times she handcuffed him in the bathtub—at least one time filled with ice—overnight, wearing (if anything) only a diaper or underwear; Babin would not let him sleep.

Defendants did not treat their own children the way they treated D.B.

D.B. never revealed defendants' abuse to his social workers, teachers, or doctors because Babin told him he "would get in really a lot of trouble" if he did. Instead, he told social workers during in-home visits that he was playing sports and having fun. He told his doctor that the injury on his ankle caused by the constant handcuffing was caused by playing football or falling in the street.

In May 2012, Babin's cousin, Steven, came to visit defendants. They celebrated Cinco de Mayo into the early morning hours, during which Steven observed defendants use cocaine and marijuana. The next morning, while defendants were still sleeping, Steven entered D.B.'s room and asked why he was not eating pancakes with the other children. D.B. initially responded, "Don't worry about it," but eventually told Steven he was hungry. Steven brought him a sandwich, chips, fruit snacks, and cereal bars. D.B. kept asking Steven to bring him more food. When Steven asked D.B. why he was still in

---

3    Although D.B. had no memory of doing so, one witness testified he defecated in his bedroom and smeared feces on the walls.

his bed, D.B. made Steven "swear to God" he would not tell anyone; D.B. then showed that his leg was handcuffed to the bed. Steven was shocked. To keep calm, he went to the closet in D.B.'s room to get a guitar to compose himself while he figured out what to do. When Steven opened the closet door, he saw baby N.M. strapped into an infant carrier on the closet floor. T.B., who had just come into the room, told Steven it was "just sorta a normal deal" because the baby cried too much.

Steven was confused and scared and began to cry. He walked around the block and called his girlfriend, mother, and sister to get their advice. They decided Steven would return to the house and take D.B., and Steven's sister would call the police. Steven returned to the house, and he and D.B. ran to a nearby fast-food restaurant. D.B. was not wearing shoes and could not keep up with Steven, so Steven carried him. Steven bought D.B. as many as 10 sandwiches while they waited for the police. At some point, D.B. went into the bathroom, removed his diaper, and put it in the trash, where police recovered it later.

Police arrived and took D.B. to Polinsky Children's Center. Shari Rouse, a forensic interviewer at Rady Children's Hospital, interviewed D.B. D.B. quietly told her what had happened to him. Rouse said D.B.'s flat affect during the interview was common among abuse victims.

Premi Suresh, a pediatrician at Rady Children's Hospital who specializes in child abuse, examined D.B. Urinalysis showed cocaine in D.B.'s urine, which could have been ingested through someone else's urine. Suresh noted the injuries and hyperpigmentation marks to D.B.'s ankles were consistent with being handcuffed for a period of weeks. He

7

had bruises on his back (an unusual place for children to be bruised), shoulder, and abdomen consistent with having been hit with heavy plastic bottles. And he had abrasions consistent with having been hit and scratched with fingernails.

A skeletal survey revealed a weeks-old fracture to D.B.'s right hand consistent with having been kicked. The survey also revealed bone demineralization consistent with inadequate nutrition—his bones were comparable to those of a child three years younger. Based on D.B.'s current and historical medical records, Suresh plotted D.B.'s height and weight on growth charts, which showed he was extremely underweight and under height for his age—he had even fallen off the growth chart at one point. Suresh diagnosed D.B. with failure to thrive. With normal eating, D.B. gained weight.

Based on D.B.'s history, his medical examination, the radiographic images, and the growth charts, Suresh opined D.B. had been physically abused and could have suffered complications that would have led to his death.

Meanwhile, police searched defendants' house. In D.B.'s room they found a fitted sheet on his upper bunk mattress, with a plastic sheet duct-taped over a mattress pad; crumbs, a Pedialyte bottle, and a food wrapper under D.B.'s mattress; and N.M. in a car seat just outside the closet door. In Ka.B.'s bedroom, police found handcuffs underneath a "leopard-type covering on a bean-bag chair, in the corner of the room." In the master bedroom police found paraphernalia consistent with marijuana and cocaine use. In the kitchen police found rolls of duct tape and a locked cabinet with food in it. And in the bathroom police found a diaper sprayer connected to the toilet.

8

*The Defense Cases*

Both defendants largely denied D.B.'s allegations. They presented testimony from social workers who said D.B. appeared healthy and happy when they visited and went on walks alone with him during his stay with defendants.[4] Other witnesses testified they saw D.B. participate in family meals and activities.

Barrowclough testified he never saw D.B. being abused, never put handcuffs on D.B., did not approve of Babin handcuffing him, and actually threw the handcuffs in the trash once (though they somehow reappeared in the house). He also claimed it was actually D.B.'s idea to use handcuffs to keep himself from sneaking food. Barrowclough presented the testimony of a forensic and clinical psychologist who testified Barrowclough has avoidant personality disorder that causes him "to take a pass when others of us might assert ourselves" to "avoid conflict and tension." Barrowclough's mother also testified, explaining that Barrowclough suffered head trauma when he was young, had an abusive father, and struggled with D.B.'s behavior.

Babin presented the testimony of a licensed psychologist who opined Babin had opiate dependency and an adjustment disorder with anxiety, which, when combined with her lack of sophistication and education, caused Babin to be overwhelmed by the challenges posed by D.B., who had some special needs for which she was not trained. The doctor believed his conclusions were supported by D.B.'s misbehavior while placed with his adoptive parents after his removal from defendants' home.

---

4    The record indicates D.B. sued the county and certain of its social workers for mishandling his dependency case.

*The Prosecution Rebuttal Case*

The People called a social worker to counter the social workers called by the defense. The social worker, who saw D.B. in March 2012, described him as looking "emaciated" and "sickly"—"[h]is face looked like it had no fat in it," and he had dark circles under his eyes and a bruise on his cheek. She directed defendants to take D.B. to the doctor, which they did after one day's delay. A follow-up medical exam was scheduled for May 4, but defendants did not take D.B. to the appointment.

The People also called D.B.'s adoptive mother, who acknowledged D.B. misbehaved and had difficulty adjusting when he was first placed with her and her husband. She admitted his behavior was so troublesome that they reconsidered D.B.'s adoption. However, after therapy and medication, the problems were resolved and they adopted D.B.

*Jury Verdict and Sentencing*

On July 27, 2012, the People filed an information charging both defendants with torture (Pen. Code, § 206; count 1);[5] felony child abuse of D.B. (§ 273a, subd. (a); count 2); false imprisonment (§§ 236, 237, subd. (a); count 4); and felony child abuse of their daughter K.B. (§ 273a, subd. (a); count 7).

The information also charged Babin alone with attempting to dissuade a witness from reporting a crime (§ 136.1, subd. (b)(1); count 3); assault by means likely to produce great bodily injury as to baby N.M. (§ 245, subd. (a)(4); count 5); felony child

---

[5] All unspecified statutory references are to the Penal Code.

10

abuse as to baby N.M. (§ 273a, subd. (a); count 6); and assault by means likely to produce great bodily injury as to D.B. (§ 245, subd. (a)(4); count 8). The information alleged an enhancement for great bodily injury inflicted in the commission of the felony child abuse and the assaults. (§ 12022.7, subds. (d), (e).)

Defendants were tried jointly over the course of 10 court days. After fewer than 10 hours of deliberation, the jury convicted Barrowclough of felony child abuse of D.B. (count 2) and false imprisonment (count 4), but found him not guilty of torture (count 1) and felony child abuse of K.B. (count 7). The court sentenced him to an aggregate term of six years in prison.

The jury convicted Babin of torture (count 1), attempting to dissuade a witness from reporting a crime (count 3), false imprisonment (count 4), and assault by means likely to produce great bodily injury as to D.B. (count 8). The jury also found true the great bodily injury enhancement attached to count 8. The jury found Babin not guilty of the assault and child abuse counts regarding baby N.M. (counts 5 and 6) and the felony child abuse count as to K.B. (count 7). For reasons we shall explain, the jury did not reach a verdict on the felony child abuse count as to D.B. (count 2). The court sentenced Babin to a determinate term of eight years four months, followed by a consecutive term of life with the possibility of parole.

11

DISCUSSION

I.

*Instructional Error*

Babin contends the trial court erroneously instructed the jury that child abuse is a lesser included offense of torture.  She argues that "under the unique circumstances of this case," where the jury was also instructed these counts were charged in the alternative (such that defendants could be convicted of only one count and not both) and where the court gave an ambiguous response to a jury question about these counts, the instructional error was prejudicial and requires reversal.  The People concede the instruction regarding lesser included offenses was erroneous, but argue the error was harmless.  We accept the People's concession,[6] and agree there was no prejudice.

A.     *Relevant Trial Court Proceedings*

At the prosecutor's request and without objection from defense counsel, the trial court instructed the jury that the torture and child abuse counts were charged in the alternative and explained the significance of that status:

---

[6]     Applying the "elements test," "we look to see if all the legal elements of the lesser crime are included in the definition of the greater crime, such that the greater cannot be committed without committing the lesser." (*People v. Moon* (2005) 37 Cal.4th 1, 25.) Because a victim of torture can be an adult but a victim of child abuse cannot, one can commit torture without necessarily committing child abuse. (See *People v. Baker* (2002) 98 Cal.App.4th 1217, 1223 [elements of torture]; *People v. Sargent* (1999) 19 Cal.4th 1206, 1215-1216 [elements of child abuse]; see, e.g., *People v. Scott* (2000) 83 Cal.App.4th 784, 794 [nonforcible sex crimes that require the perpetrator and victim to be within certain age limits are not lesser included offenses of forcible sex crimes with no age limits].)  Therefore, child abuse is not a lesser included offense of torture.

"The defendants are charged in Count 1 with Torture and in Count 2 with Child Abuse likely to cause Great Bodily Injury. These are alternative charges. If you find the defendant guilty of one of these charges, you must find him or her not guilty of the other. You cannot find the defendant guilty of both." (See CALCRIM No. 3516.)

The trial court further instructed the jury that child abuse is a lesser included offense of torture and explained the impact of that relationship on how to deliberate and complete the verdict forms:

"If all of you find that the defendant is not guilty of a greater charged crime, you may find him or her guilty of a lesser crime if you are convinced beyond a reasonable doubt that the defendant is guilty of that lesser crime. A defendant may not be convicted of both a greater and lesser crime for the same conduct.

"Now I will explain to you which charges are affected by this instruction:

"Child Abuse, as charged in Count 2, is a lesser crime to Torture, as charged in Count 1.

"It is up to you to decide the order in which you consider each greater and lesser crime and the relevant evidence, but I can accept a verdict of guilty of the lesser crime only if you have found the defendant not guilty of the greater crime.

"For any count in which a greater and lesser crime is charged, you will receive verdict forms of guilty and not guilty for the greater crime and lesser crime. Follow these directions before you give me any completed and signed, final verdict form. Return any unused verdict forms to me, unsigned.

"1. If all of you agree the People have proved that the defendant is guilty of the greater crime, complete and sign the verdict form for guilty of that crime. Do not complete or sign any verdict form for the corresponding lesser crime.

"2. If all of you cannot agree whether the People have proved that the defendant is guilty of the greater crime, inform me of your

13

disagreement and do not complete or sign any verdict form for that crime or the corresponding lesser crime.

"3.  If all of you agree the People have not proved that the defendant is guilty of the greater crime and also agree the People have proved that he or she is guilty of the lesser crime, complete and sign the verdict form for not guilty of the greater crime and the verdict form for guilty of the corresponding lesser crime.  Do not complete or sign any other verdict forms for those charges.

"4.  If all of you agree the People have not proved that the defendant is guilty of the greater or lesser crime, complete and sign the verdict form for not guilty of the greater crime and the verdict form for not guilty of all corresponding lesser crimes.

"5.  If all of you agree the People have not proved that the defendant is guilty of the greater crime, but all of you cannot agree on a verdict for the lesser crime, complete and sign the verdict form for not guilty of the greater crime and inform me about your disagreement on the lesser crime.

"Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt."  (See CALCRIM No. 3519.)

During deliberation, the jury sent a note to the trial court, which stated:

"If the jury is undecided on Count #1, may we move on to Count #2, leaving the verdict form unsigned?"

"May we reach a verdict on Count #2 if we are unable to reach a unanimous verdict in Count #1?"

The trial court responded, "Please refer to jury instruction 3516.  If you need further assistance do not hesitate to write another note."

Babin contends the trial court's response to the jury question erroneously directed the deadlocked jury to CALCRIM No. 3516 regarding alternative charges rather than to CALCRIM No. 3519 regarding lesser included offenses, and consequently constrained

14

the order in which the jury considered the charges, thus encouraging the jury to return a guilty verdict on the torture count instead of on the child abuse count.

### B.     *The Instructional Error Caused No Prejudice*

We review an erroneous instruction regarding lesser included offenses under the *Watson* standard of review, reversing "only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error."  (*People v. Watson* (1956) 46 Cal.2d 818, 836; see *People v. Breverman* (1998) 19 Cal.4th 142, 177.)  Applying this standard, we find no prejudice.

First, Babin's argument is premised on the unsupported assumption that the jury had "reached an impasse."  The jury's question never declared they were at an impasse; it merely asked what would happen "*[i]f* the jury is undecided" or "*if* [the jury is] unable to reach a unanimous verdict" on the torture count.  (Italics added.)  It is unduly speculative to conclude from this question that the jury was, in fact, deadlocked at that point.  Indeed, drawing such a conclusion at that stage in deliberations strikes us as premature—after 10 days of trial, the jury had deliberated no more than about five and one-half hours before asking the question, and reached unanimous verdicts after only about four more hours of deliberation.  Thus, the fundamental factual premise underlying Babin's prejudice argument is untenable.

Second, the trial court's response to the jury question did not direct the order of deliberations or improperly focus the jury on the torture count; the response merely stated the jury could not convict defendants on both counts.  Even if the court's response had

directed the jury to CALCRIM No. 3519, as Babin contends it should have, that instruction specifically informed the jury "[i]t is up to you to decide the order in which you consider each greater and lesser crime and the relevant evidence."[7] And as to the torture count, the instruction informed the jury it could (1) find defendants guilty of torture, (2) find them not guilty of torture, or (3) inform the court they could not agree. The unbiased presentation of these options did not encourage a guilty verdict.

Third, the trial court instructed the jury *twice* it could not convict defendants of torture (or any other count) unless their guilt was proven beyond a reasonable doubt. (See CALCRIM Nos. 220, 3519.) We presume the jury followed this instruction. (See *People v. Yeoman* (2003) 31 Cal.4th 93, 139.)

Finally, as the People argue, their trial strategy of pursuing the torture and child abuse claims in the alternative actually benefitted defendants by ensuring they would not be convicted of both counts. Because Babin acknowledges child abuse is not a lesser included offense of torture, the jury theoretically could have convicted her of both counts absent the prosecutor's strategy. Although that strategy was implemented through erroneous jury instructions, the strategy nonetheless benefitted Babin.

For these reasons, we conclude it is not reasonably probable Babin would have obtained a more favorable outcome had the trial court not erred by instructing the jury that child abuse is a lesser included offense of torture.

---

7       In a separate instruction, the court also instructed the jury that it "must consider each count separately."  (See CALCRIM No. 3515.)

16

## II.

### *Denial of Mistrial Motion*

Babin contends the trial court erred by denying her mistrial motion based on the prosecution's medical expert tearing up on the witness stand.

### A.    *Relevant Trial Court Proceedings*

Early in Dr. Suresh's direct examination, the following exchange occurred:

"Q.  Okay.  How is it that you came in contact with [D.B.], what was the first thing you had learned about him?"

"A.  Well, I came in that day and, um, sorry. Um, the nurses let me know that there was a patient in the back room who was, um, severely, um—they were concerned about, and so I, um, was going to do my evaluation of him."

"Q.  Do you need a minute?"

"A.  Yeah, I am sorry."

"Q.  That's okay.  Um, there is some water if you need it."

"A.  Okay."

"[Babin's counsel]:  Judge, may we be heard at the side, please?"

"The Court:  Yes."

After an unrecorded sidebar conference, the trial court excused the jury for a brief recess.  Once the jury and witness were outside the courtroom, the trial court noted that when Suresh was initially asked about her first contact with D.B. "she did become very emotional, tears did come to her eyes."  The trial court explained it ordered a brief recess so the witness could "regather" herself outside the presence of the jury.

17

Babin's counsel moved for a mistrial, arguing that as an expert witness, Suresh's emotional response was "grossly unprofessional," "inflammatory," and "prejudicial." The prosecution disagreed, arguing that it was speculative that the jury was prejudiced by Suresh becoming "a little bit emotional."

The court acknowledged Suresh's emotional response might suggest "this was a more difficult case" for her to evaluate, but added, "[f]or all I know she cries every time she [testifies]." The court noted Suresh's response was "very, very brief"—"30 seconds or less"—and constituted just a "snippet" in the context of the overall trial. The court concluded it cured any potential prejudice by immediately ordering a recess. For those reasons, the court denied Babin's motion for mistrial, but allowed defense counsel to cross-examine Suresh regarding her emotional response and to comment on it during closing.

Following Suresh's testimony, the trial court noted Suresh had calmed down and testified without any further emotional issues.

During closing arguments, Barrowclough's counsel commented that one of the testifying police officers "appeared to be tearing up" during her testimony, which counsel considered "odd," but "less odd . . . than Dr. Suresh, who for some reason started crying at the beginning of her testimony. And she's an expert in child abuse, she probably deals with some of the most horrifying things any of us could ever imagine. This case isn't one of them. And so why she cried when talking about[D.B.], is a big question."

In her rebuttal closing, the prosecutor responded: "[I]t's interesting that much was made about some of the witnesses getting emotional. Yeah, they got emotional. I

18

disagree that this isn't one of the worst kinds of cases of abuse. Yeah, Dr. Suresh is an expert in child abuse. It's what she sees day in and day out. And . . . when I asked her about, 'tell us about when you first saw [D.B.],' and she got emotional. She's a human being. She's a human being with a heart, who cared about this child, which is a lot more than we can say about these defendants."

In its charge to the jury, the trial court instructed "not [to] let bias, sympathy, prejudice, or public opinion influence [their] decision."

B. *The Trial Court Did Not Err in Denying the Mistrial Motion*

"A trial court should grant a motion for mistrial 'only when " 'a party's chances of receiving a fair trial have been irreparably damaged' " ' [citation], that is, if it is 'apprised of prejudice that it judges incurable by admonition or instruction' [citation]. 'Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.' [Citation.] Accordingly, we review a trial court's ruling on a motion for mistrial for abuse of discretion." (*People v. Avila* (2006) 38 Cal.4th 491, 573.)

The trial court did not abuse its discretion in denying Babin's mistrial motion. As the court indicated, Suresh's emotional display was a mere 30-second "snippet" on the fourth day of a 10-day trial. The court immediately ordered a recess and Suresh composed herself for the remainder of her testimony. The court also instructed the jury not to let bias or sympathy impact its decision, and the jury is presumed to have followed this instruction. (*People v. Yeoman, supra*, 31 Cal.4th at p. 139.)

19

We are unpersuaded by Babin's argument that Suresh's crying "communicated to the jury that [D.B.'s] situation was much more serious than the average case handled by Suresh or that she knew something the jury did not know." Although the trial court itself acknowledged this inference was possible, the court countered "[f]or all I know she cries every time she [testifies]." Given the lack of foundation regarding Suresh's normal disposition during trial—a topic defense counsel could have explored but did not—we find no error.

Finally, the cases Babin cites do not assist her. *People v. Fuiava* (2012) 53 Cal.4th 622 and *People v. Vance* (2010) 188 Cal.App.4th 1182 each involved distinct efforts by the prosecutor to inflame the jury's passions. (*Fuiava*, at p. 693 [prosecutor improperly elicited emotional testimony from police officer about his partner's death and focused on it unduly during closing argument]; *Vance*, at pp. 1199-1200 [prosecutor violated the "Golden Rule" by arguing to jurors that they " 'have to walk in [the victim]'s shoes. You have to literally relive in your mind's eye and in your feelings what [the victim] experienced the night he was murdered. You have to do that. You have to do that in order to get a sense of what he went through.' "].) By contrast, the prosecutor here did not elicit Suresh's emotional response; she simply asked Suresh how she came in contact with D.B. and what she had learned about him.[8] The prosecutor's reference to

---

[8]     Suresh's apparently genuine emotional response is distinguishable from the expert's testimony in *People v. Wallace* (2008) 44 Cal.4th 1032 that he assumed the defendant had committed a crime because "[w]e wouldn't be here if he didn't commit something." (*Id.* at pp. 1066, 1068-1069 [affirming trial court's denial of mistrial motion].)

Suresh's emotions during closing arguments came only in rebuttal to Barrowclough's counsel's references during closing argument and were not unduly impassioned or inflammatory.

The trial court did not abuse its discretion in denying Babin's mistrial motion.

III.

*Staying Sentences Under Section 654*

Babin contends the trial court erred by failing to stay the sentences on her convictions for witness dissuasion, false imprisonment, and assault as being impermissibly duplicative of the sentence on her torture conviction. (§ 654.) Barrowclough joins in the argument, asserting the sentence on his false imprisonment conviction is impermissibly duplicative of the sentence on his child abuse conviction.

A. *Relevant Legal Principles*

Section 654 provides in pertinent part, "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, *but in no case shall the act or omission be punished under more than one provision.*" (Italics added.) " 'Section 654 precludes multiple punishments for a single act or indivisible course of conduct.' " (*People v. Galvez* (2011) 195 Cal.App.4th 1253, 1262 (*Galvez*).) When it applies, "the accepted 'procedure is to sentence defendant for each count and stay execution of sentence on certain of the convictions to which section 654 is applicable.' " (*People v. Jones* (2012) 54 Cal.4th 350, 353.) " 'Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends

21

on the intent and objective of the actor.  If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' " (*People v. Correa* (2012) 54 Cal.4th 331, 336.)  However, " '[i]f . . . defendant harbored "multiple criminal objectives," which were independent of and not merely incidental to each other, he may be punished for each statutory violation committed in pursuit of each objective, "even though the violations shared common acts or were parts of an otherwise indivisible course of conduct." ' " (*Galvez*, at pp. 1262-1263, italics added.)

Moreover, " 'a course of conduct divisible in time, although directed to one objective, may give rise to multiple violations and punishment . . . .'  [Citations.]  This is particularly so where the offenses are temporally separated in such a way as to afford the defendant opportunity to reflect and to renew his or her intent before committing the next one, thereby aggravating the violation of public security or policy already undertaken." (*People v. Gaio* (2000) 81 Cal.App.4th 919, 935.)  The opportunity to reflect need not be very long.  (See, e.g., *People v. Trotter* (1992) 7 Cal.App.4th 363, 367-368 (*Trotter*) [section 654 inapplicable where defendant fired three shots at police officer, where first two shots were separated by about one minute and second and third shots were separated by only seconds]; *People v. Harrison* (1989) 48 Cal.3d 321, 325, 335-336 (*Harrison*) [section 654 inapplicable where defendant committed three acts of vaginal penetration during a span of seven to 10 minutes]; *People v. Clair* (2011) 197 Cal.App.4th 949, 959-960 (*Clair*) [section 654 inapplicable to e-mails defendant sent depicting child

22

pornography, where some were sent to the same recipient between 10 minutes and almost three hours apart].)

We presume from the fact that the trial court imposed consecutive sentences that it found defendants acted under multiple criminal objectives or under a single objective but with sufficient opportunity to reflect and renew his or her intent. (See *People v. Jones* (2002) 103 Cal.App.4th 1139, 1147.) We review the trial court's implied finding for substantial evidence. (*People v. Blake* (1998) 68 Cal.App.4th 509, 512; see *People v. Kwok* (1998) 63 Cal.App.4th 1236, 1252-1253.)

### B.    *Analysis*

Substantial evidence supports the trial court's implicit finding that defendants acted either with multiple criminal objectives or under a single objective but with sufficient opportunity to reflect and renew his or her intent.[9]

The trial court could reasonably have found that defendants acted under multiple criminal objectives in punishing D.B. depending on his triggering conduct. For example, defendants may have acted with different intents when D.B. acted out, stole food at school, snuck out of bed at night to take food from the kitchen, ate the frozen pizza on the way to Big Bear, or tried to run away from home. Substantial evidence supports a finding based on any of these intents.

Similarly, the six-month window during which defendants committed the charged offenses was punctuated with sufficient intervening breaks that the trial court could

---

[9]    We note that neither defendant challenges the sufficiency of the evidence supporting their underlying convictions.

23

reasonably have found defendants had an opportunity—or *several*—to reflect on and renew their intent. D.B. was not constantly handcuffed to his bed—he visited the doctor, went on unaccompanied walks with his social workers, went on a family trip to Big Bear, and participated in some family events. Many of these breaks were longer than the minutes or hours found sufficient in *Trotter*, *Harrison*, and *Clair*. Therefore, even if defendants acted with a single objective, the trial court could reasonably have found that defendants' resumption of their torture, abuse, false imprisonment, and assault of D.B. following these opportunities for reflection indicated a renewed intent that rendered each new offense separately punishable.

As for Babin's conviction for dissuading a witness, the trial court could easily have found Babin's intent in torturing D.B. differed from her intent in attempting to avoid punishment for doing so. (See, e.g., *People v. Nichols* (1994) 29 Cal.App.4th 1651, 1657 ["We find substantial evidence that appellant had two separate objectives: (1) to hijack the truck by kidnapping and robbing the victim and (2) to avoid detection and conviction by dissuading and intimidating the victim."].)

Substantial evidence supports the trial court's implicit finding that section 654 does not prohibit imposing separate sentences on each of defendants' convictions.

24

DISPOSITION

The judgment is affirmed.

HALLER, J.

WE CONCUR:

BENKE, Acting P. J.

O'ROURKE, J.